[Civ. No. 8516. Fourth Dist., Div. One. July 10, 1967.]

EL TEJON CATTLE COMPANY, Plaintiff and Respondent, v. THE COUNTY OF SAN DIEGO, Defendant and Appellant.

450

Bertram McLees, Jr., County Counsel, and Lawrence Kapiloff, Deputy County Counsel, for Defendant and Appellant.

Conron, Heard, James & Hamilton, Conron, Heard & James and Calvin H. Conron, Jr., for Plaintiff and Respondent.

WHELAN, J.—Plaintiff brought an action for refund of personal property taxes for 1964-1965 paid under protest.

The complaint alleged that a petition was filed with the Board of Equalization on July 14, 1964 and was denied, of which petition a copy was attached to the complaint. That petition alleged: ". . . that the Appraiser through mathematical error or inadvertence has assessed to Petitioner property not owned by Petitioner, the exact nature of which Petitioner does not know, but upon information and belief alleges to be in excess of $60,000.00."

In its claim for refund, plaintiff stated: "That the taxes

were paid on an assessment in excess of the value of the property by reason of the assessor's clerical error in including in the assessment 1,175 cows of the reasonable value of $40.00 per cow, which animals did not exist.''

However, plaintiff brought the action without having had a hearing before the Board of Equalization, the application to the board having been abandoned upon the theory that the assessment upon which the refunded taxes were based was of non-existent property.

The complaint alleged: ''That for the year of 1964 the Assessor in his Tax Statement No. 202167 assessed personal property at a valuation of $131,660.00, and included in the property making the total 3000 commercial cows, when in truth and in fact Plaintiff had no more than 1825 commercial cows, subject to assessment in San Diego County; that said animals assessed at $40.00 each would total $47,000.00, which would reduce the assessed valuation from $131,660.00 to $84,660.00, and the tax of $7,740.29 to $4,903.81; that by reason of the assessment of property not in existence, Plaintiff has been erroneously taxed and Defendant unlawfully enriched in the sum of $2,836.48.''

The trial court, in holding that it was unnecessary for plaintiff to have had recourse to the Board of Equalization, adopted plaintiff's theory that the assessment covered non-existent property.

The significant findings in this regard were as follows: ''It is true that on the 1964 lien date the number of commercial cows owned and/or in the possession of the Plaintiff, located in San Diego County on that certain property owned by Vista Irrigation District, commonly known as the 'Warner Ranch,' was no more than 1825 in number.

''. . . . . . . . . . . . .

''That it is true that the Assessor attempted to assess 3,000 cows at $40.00 per cow, and that the assessment amounted to 1,175 more cows than were upon the property or in San Diego County on tax date.''

There was no finding as to what a ''commercial cow'' is, nor whether there were any cattle or other personal property subject to assessment other than ''commercial cows'' in the County of San Diego, nor any finding of what tax should properly have been assessed and paid.

## THE EVIDENCE

There was a single assessment as follows: ''Personal property value 131660.''

The personal property was kept in San Diego County on a 47,000-acre ranch, known as Warner's, of which plaintiff was lessee.

Two deputy assessors made a count of cattle at the ranch on March 10, 1964, one week after the lien date. They counted 3,000 "commercial cows," by which they meant female animals of producing age, including first-calf heifers and upwards. The count possibly included heifers. Those animals were among the personal property assessed, the remainder being 60 commercial bulls, 140 commercial heifers ("1 year up") and 17 saddle horses.

No calves were assessed. The deputy assessor testified it was not possible that as many as half of the 3,000 "cows" counted were calves.[1]

Plaintiff's sworn property statement listed 610 cows over two years, 110 heifers one to two years, 120 calves three to six months, 30 fully-aged bulls, no steers, and no weaner calves. The form for the property statement provided for steers in two different age classes and weaner calves in different classifications for heifers and steers.

The court's finding that there were 1,825 cows was based upon the testimony of plaintiff's witness, La Force. The same witness testified that when he made his count there were additionally on the ranch 357 heifers and 99 bulls.

Plaintiff's cattle foreman also testified for plaintiff that from March 11 to March 17, 1964, he had supervised branding operations at the ranch when he counted the cows whose calves were being branded. There were 1,378 such calves. In addition to the mothers of such calves, there were other cows that had not calved. According to that witness there were 1,793 cows of an age for breeding.

The phrase "commercial cows," it may be assumed from a colloquy between court and counsel for defendant, was taken by them to mean cows over two years old.

Plaintiff's oral evidence was directed wholly to show the number of cows of breeding age on the ranch.[2]

---

[1] Deposition of Richard J. Hiel in evidence by stipulation.

[2] Early in the trials the following occurred during cross-examination of one of plaintiff's witnesses:

"Q   How many cows?
"A   1835.
"Q   Any bulls?
"A   99.
"Mr. Conron: Just a minute. I object to that as not within the issues

Documentary evidence produced by plaintiff showed the following:

A count made August 11, 1964 at Warner's by a bank appraiser showed the number of "cows culled" as follows: 975 cows four years old, 308 cows three years old, 307 heifers two years old, 357 heifers one year old, 27 Angus, 61 bulls, 150 cow-pairs (cow with calf) ; at that time plaintiff owned a total of 6,729 cattle, of which 1,555 were calves having a value of from $105 to $128 each; 87 bulls; 2,981 steers, none described as being less than two years old; 1,666 cows of three years and over; and 440 two-year-old heifers. Their total value according to the bank appraiser was $1,303,252.

Other than those located on the Warner Ranch, of the 6,729 cattle owned on August 11, 1,183 head were at four locations in counties other than San Diego: Cooper's, Villard's, Bidart Brothers' feed lot, and Winter's.

Plaintiff had the heifers bred as yearlings on the Warner Ranch. The calving season was from November to March.

A financial statement prepared as of July 31, 1964, showed operations during the preceding 12 months. That report also showed a total of 1,183 head at Winter's, Villard's, the feed lot, and Cooper's; showed there were at Warner's 1.590 cows two years or over, 357 heifers one to two years, 78 bulls and 1,440 calves; and showed the inventory value of all of plaintiff's cattle, based upon market value as of July 31, 1964, to be $855,785, and that since August 1, 1963, there had been sales of cattle amounting to $865,053 and purchases of $30,501.

### PRELIMINARY DISCUSSION

We deal with a situation in which a taxpayer has made a sworn statement required by law in which it lists its personal

---

here. We're not claiming any mis-assessment of bulls; immaterial.

"MR. KAPILOFF: I think that, according to the allegations made, the County of San Diego assessed the property that was non-existent. I want to find out exactly what was on the property when the lien was taken——

"MR. CONRON: I claim you assessed 3,000 cows and that there are only 1835. I didn't talk about anything else.

"THE COURT: Are cows—we don't have too many cow cases here. Do you assess cows separately from the bulls?

"MR. CONRON: Right.

"THE COURT: Is that correct?

"MR. KAPILOFF: Yes.

"Then, as I understand it, Mr. Conron, you're not objecting at all to the assessment made or to that portion of the assessment which was on cows, heifers, or any other livestock on the property?

"MR. CONRON: No, any other livestock than commercial cows.

"THE COURT: Objection sustained."

property as consisting of 870 cattle of different ages and sexes. It included 610 cows and 120 calves over three to six months old.

The assessor has made a single assessment of $131,660 for the plaintiff's personal property. In arriving at that figure, the assessor used as factors 3,000 cows of the value of $40 each, 200 other cattle, none of them calves, and some horses.

After paying the tax upon the assessed value, the property owner alleged it had not 3,000 cows, but 1,825. It sued to recover the tax that would have been paid on 1,175 cows if that number had been separately assessed. It did not offer to pay any tax on the 120 calves that it listed in its declaration which may not have been covered by the assessment. Although it had filed an application for equalization of the assessed value of its property, it did not pursue the application but withdrew it.

Having brought its action for a refund without prior consideration by the Board of Equalization, plaintiff produced testimony that on the lien date it had only 1,825 cows. The same testimony showed that at the same time plaintiff had 1,378 calves old enough to be branded in the annual branding, their age not otherwise indicated, 357 heifers, and 99 bulls.

The plaintiff had in the state on July 31, 1964, 6,729 cattle, of which 2,981 were steers of two years or over, and of which 1,183 were at locations outside San Diego County, although only 3,465 were said to be in San Diego County.

It may be inferred from the value of the inventory of cattle on July 31, from the amount of sales and purchases during the preceding 12 months, that plaintiff had no fewer cattle during that 12-month period than on July 31.

There are, therefore, possible errors on the part of the assessor as to the age of some of the cattle intended to be assessed; and there is also the possibility on the evidence produced by plaintiff that some of its cattle subject to taxation were not included in the calculations of the assessor.

In fixing the amount of the assessment, it was intended to place a valuation of $40 each on cows; if $120,000 of the total assessment be apportioned mentally as representing the assessed value of all of plaintiff's cows, and plaintiff owned only 1,825 cows, the $120,000 figure might also be regarded as the result of placing a valuation of $65.75 per head on the cows.

Because of these considerations, and since there is no separate assessment of 3,000 cows, nor of 1,175 cows, nor of 1,825 cows, nor of any other group of bovine animals owned by plaintiff, it may be arbitrary to say that the assessment was of non-existent property.

### The Question Presented

In essence, the question presented is this: Where personal property assessed in a single assessment includes numerous items of the same generic character, classified within several groups according to quality, age or condition, all of a character subject to taxation, and the correctness of the assessment is challenged based upon a question as to the number, quantity or extent of the items within only one of the groups, must application be made by the taxpayer to the Board of Equalization for reduction of the assessment before action may be sustained in the superior court for relief from the claimed over-assessment?

We are of opinion that application for relief must first be made to the Board of Equalization.

The Board of Equalization is a constitutionally created quasi-judicial body with the duty of seeing that all property in the county subject to taxation is on the assessment roll. In passing upon an application for reduction of an assessment, it can determine not only whether an assessment of property is excessive but also whether it is too low, and whether other property of the taxpayer may have escaped assessment.

To permit an attack in court upon a single assessment of property that is subject to taxation without prior resort to the Board of Equalization and after the assessment roll is equalized might in many cases result not in an unjust enrichment of the taxing authority but of the property owner. The reason why that result should not be permitted is obvious.

In *Pope Estate Co.* v. *Johnson,* 43 Cal.App.2d 170, 174 [110 P.2d 481], a case involving a corporation franchise tax, it was said: ''A suit for a recovery of the whole or a portion of a tax for a particular year throws open all questions relating to the same tax year. Neither the tax collecting authorities nor the taxpayer are at liberty to split up the question and prosecute in the courts the question as to liability for that year piecemeal. The rule is quite absolute in its character. . . .''

MEASURING OR COUNTING THE QUANTITY OR EXTENT OF TAXABLE PROPERTY IS WITHIN THE JURISDICTION OF THE BOARD OF EQUALIZATION.

In *Farmers' etc. Bank* v. *Board of Equalization,* 97 Cal. 318 [32 P. 312], the Board of Equalization after a hearing increased the amount of solvent credits assessed from $2,774 to $275,000. The trial court's judgment overruling a demurrer to the taxpayer's complaint was reversed. The court said at page 328 : ". . . whether the petitioner had property which had escaped assessment was in any sense jurisdictional, it was nevertheless a fact, as to the existence of which the board was authorized and required to determine in that proceeding."

*H. D. Haley & Co.* v. *McVay,* 70 Cal.App. 438 [233 P. 409], dealt in part with the power of the Board of Supervisors to enter into a contract for a "cruise and estimate of all timber" on certain lands to enable the board, sitting as a board of equalization, to perform its duties.

The power of the board in that respect was upheld.

RECOVERY UNDER SECTION 5096, REVENUE AND
TAXATION CODE

Section 5096, Revenue and Taxation Code provided in relevant part in 1964 :

"On order of the board of supervisors, any taxes paid before or after delinquency shall be refunded if they were :

"(b) Erroneously or illegally collected.

"(c) Paid on an assessment in excess of the cash value of the property by reason of the assesssor's clerical error.

"(d) Paid on an assessment of improvements when the improvements did not exist on the lien date."

WHAT IS MEANT BY TAXES ILLEGALLY AND ERRONEOUSLY
COLLECTED ?

█ The collection of taxes on property exempt from taxation is an erroneous or illegal collection within the meaning of section 5096, Revenue and Taxation Code. (*City of Long Beach* v. *Board of Supervisors,* 50 Cal.2d 674, 679 [328 P.2d 964].)

█ Another instance of erroneous or illegal collection is where the tax rate has been fixed upon an assessed valuation that excludes from the levy a material portion of the property on the tax rolls. (*Otis* v. *County of Los Angeles,* 9 Cal.2d 366, 377 [70 P.2d 633].)

■ But an error as to the value or amount of property subject to taxation is not therefore erroneously made within the meaning of the legislation presently embodied in section 5096. (*Southern Cal. Hardwood etc. Co.* v. *County of Los Angeles*, 49 Cal.App. 712 [194 P. 62].)

### PROPERTY EXEMPT FROM TAXATION

Many of the cases cited by plaintiff have dealt with property exempt from taxation. As we have seen, taxes assessed against such property and collected are illegally and erroneously collected. ■ In the case at bench we are not dealing with property exempt from taxation and cases dealing with that subject are helpful in only a limited way.

*Parr-Richmond Industrial Corp.* v. *Boyd,* 43 Cal.2d 157 [272 P.2d 16], may be classed with *Brenner* v. *City of Los Angeles,* 160 Cal. 72 [116 P. 397], dealing with the assessment of an interest in property that was exempt from taxation.

Such another case of the taxation of exempt property is *Parrott & Co.* v. *City & County of San Francisco,* 131 Cal. App.2d 332, 342 [280 P.2d 881]. There the court noted: "The function of a County Board of Equalization, as its name implies, is to increase or lower an assessment in order to equalize property assessments on the local rolls, and to make the assessment conform with the true value of the property. (See Rev. & Tax. Code, §§ 1605, 1608.) In the instant case evaluation or revaluation is not involved at all. *Here the foreign imports were segregated from the other properties of the taxpayer, and separately assessed. The taxpayers claim, and properly so, that this total assessment was a nullity—* beyond the power of the taxing officials to impose. In such a case there is no question of valuation that must be presented to the Board of Equalization for correction before judicial review may be sought. (*Parr-Richmond Industrial Corp.* v. *Boyd,* 43 Cal.2d 157, 165 [272 P.2d 16].)" [Italics added.]

We have emphasized the clause about the separate assessment of the property claimed to be exempt because of the holding in *City & County of San Francisco* v. *County of San Mateo,* 36 Cal.2d 196 [222 P.2d 860]. There the assessment was of land only; the assessed value was in large part represented by an increase in value resulting from filling the land with earth; the filling was held to be an improvement made by the plaintiff City and County of San Francisco, and as such exempt from taxation. In denying the plaintiff's right to by-pass the Board of Equalization, the court said at page 201:

"The State Board of Equalization has the power 'initially' to make a correction of the error alleged in this case, and the facts do not bring it within any exception noted in the authorities cited. *It is not claimed that the assessment is a nullity in toto.* An adjustment is sought by virtue of an erroneous inclusion of exempt improvements with taxable lands. If the city was dissatisfied with the assessment as an accumulated increase in the value of the taxable property, it was necessary to apply to the state board for review and adjustment prior to pursuing the remedy for refund of taxes paid under protest.'' [Italics added.]

In *Brock & Co.* v. *Board of Supervisors,* 8 Cal.2d 286 [65 P.2d 791, 110 A.L.R. 700], also, certain personal property which was claimed not subject to taxation because temporarily out of the county on the lien date was made the subject of an assessment separate from the other personal property of the taxpayer for the purpose of testing the question.

Is The Assessment The Result of Clerical Error?

No. The distinction between clerical error and errors of substance, of judgment or of law is discussed in *Kuhlemeier* v. *County of Los Angeles,* 2 Cal.2d 257, 262 [40 P.2d 828]. We are satisfied that any error that may have occurred here was an error of judgment.

Was There An Assessment Of Non-Existent Property?

The assessment here was a single one upon personal property. Such a general description for assessment purposes is sufficient. (*Dear* v. *Weineke,* 94 Cal. 322 [29 P. 646]; *San Francisco* v. *Pennie,* 93 Cal. 465 [29 P. 66]; *Dear* v. *Varnum,* 80 Cal. 86 [22 P. 76]; *City & County of San Francisco* v. *Flood,* 64 Cal. 504 [2 P. 264].)

Judicial inquiry may be made as to what property the assessor intended to include in such a general description, so as to determine if the assessment is based upon property that is exempt, is outside the jurisdiction or is nonexistent. (*Lockheed Aircraft Corp.* v. *County of Los Angeles,* 207 Cal. App.2d 119, 127 [24 Cal.Rptr. 316].)

Certain decisions cast doubt upon the theory that an error in an assessment of the quantity or number of property of a certain kind that is subject to taxation is an assessment of nonexistent property. In each of the following cases it was held that application to the Board of Equalization with

favorable action by the board is a prerequisite to a suit to recover taxes claimed to have been paid in excess of the amount correctly owing.

In *Montgomery Ward & Co.* v. *Welch*, 17 Cal.App.2d 127 [61 P.2d 790], the assessor claimed there was property of the value of $154,300 in the taxpayer's warehouse. The taxpayer claimed that on the lien date it had in its warehouse personal property of the value of only $41,612.15 and had made a declaration of such property; that the assessor had arbitrarily assumed that the warehouse contained approximately the same quantity of goods that had been therein on the first Monday in March of the previous year (1930).

In disposing of the taxpayer's contention, the court said, at pages 133 and 134: "The case before us is purely that of a claimed over-valuation of the property and is not one of a double, erroneous or illegal assessment which is entirely void. . . . Under the statutes and the authorities above referred to we conclude that an application for relief to the board of equalization is a necessary prerequisite to the maintenance of such an action as this, and that the complaint filed by the appellant failed to state a cause of action."

*Marsh Wall Products, Inc.* v. *County of Los Angeles*, 193 Cal.App.2d 58, 63 [13 Cal.Rptr. 699], also dealt with the claim of the taxpayer that there was included in the inventory assessed property that was not a part of the inventory on the lien date. In denying the validity of the taxpayer's contention that nonexistent property had been assessed, the court made this observation: "The case now before the court involves the determination of the value of a unit of property clearly subject to tax. As heretofore noted, consideration of the physical size of such a unit is a part of the process of making a determination of the value thereof."

In *Globe Grain & Mill Co.* v. *County of Los Angeles*, 62 Cal.App. 297 [216 P. 631], the taxpayer had filed an application for reduction with the Board of Equalization that was denied in large part. Plaintiff did not, in its action to recover taxes, seek review of the board's action, but claimed a right to bring suit independent of the action of the Board of Equalization. The property assessed was solvent credits. Plaintiff taxpayer alleged, at pages 298-299: ". . . that there were not at 12 o'clock M., on the first Monday of March, 1919, in the state of California, or subject to the jurisdiction of said county or state, any solvent credits owned by plaintiff subject

to assessment or tax. . . ." The court commented, on page 300: "Appellant did have large solvent credits which primarily were subject to assessment, although in the valuation thereof it was entitled (on a proper application therefor) to a reduction measured by the amount of any debts due from it to *bona fide* residents of this state."

In *Southern Cal. Hardwood etc. Co.* v. *County of Los Angeles, supra,* 49 Cal.App. 712, 716, the problem again was as to the measure of solvent credits with relation to the measure of deductible debts. In affirming the trial court in denying relief to the taxpayer, the court said: ". . . the county assessor was mistaken in his conclusion as to the net amount of the plaintiff's properties subject to assessment and taxation; but it does not follow that merely by reason of said mistake the assessment and taxation of said property was erroneously made. The result of this mistake amounted merely to an overvaluation of the plaintiff's properties, or—which amounted to the same thing in effect—an undervaluation of the appellant's deductible debts; . . ."

Under plaintiff's theory, any error in the proper classification of property assessed could be asserted to be an assessment of property not in existence. Thus it could have been urged with regard to the assessment of bank vault doors as improvements to realty in *Security-First Nat. Bank* v. *County of Los Angeles,* 35 Cal.2d 319 [217 P.2d 946], that such improvements did not exist on the lien date, and in *California etc. Co.* v. *County of Los Angeles,* 10 Cal.App. 185 [101 P. 547], that there was no personal property in existence owned or possessed by the taxpayer on the lien date; and in *First Trust etc. Bank* v. *County of Los Angeles,* 206 Cal. 240 [273 P. 1066], that the solvent credits assessed were nonexistent, which was true, although there was a beneficial interest in a trust which was equal in value to that erroneously placed upon solvent credits.

Indeed, plaintiff here argues that in *Parr-Richmond Industrial Corp.* v. *Boyd, supra,* 43 Cal.2d 157, nonexistent property was assessed. In fact in the cited case the taxpayer had been assessed for the fee ownership of property that it did not own, and was not assessed for the possessory interest therein that it did own. The fee ownership was exempt from taxation because owned by the United States. Thus, although the fee ownership existed, the taxpayer was being assessed for property that he did not own and which in fact was exempt

from taxation. Nowhere in the opinion was it said that the property assessed was nonexistent.

It is difficult and perhaps impossible to apply to the facts of the case at bench the rationale of *Associated Oil Co.* v. *County of Orange,* 4 Cal.App.2d 5 [40 P.2d 887], or *Pacific Coast Co.* v. *Wells,* 134 Cal. 471 [66 P. 657], a reading of which leaves the impression that the decisions were not uninfluenced by the facts that in *Pacific Coast Co.* v. *Wells* both the assessor and the board of supervisors approved the refund; that in the *Associated Oil Co.* case the assessor recommended the refund and the error had not been discovered until long after the time expired for filing an application for reduction with the Board of Equalization.

THE PLAINTIFF HAS NOT ESTABLISHED THAT IT HAS PAID TAXES IN EXCESS OF WHAT IT SHOULD HAVE PAID.

The fundamental rules governing a suit for refund of taxes are stated in the following cases: *Simms* v. *County of Los Angeles,* 35 Cal.2d 303, 316 [217 P.2d 936], where it is said: "Actions to recover taxes paid under protest are equitable in nature."; *Goodwill Industries* v. *County of Los Angeles,* 117 Cal.App.2d 19, 27 [254 P.2d 877], where it is said: ". . . since a suit for a refund of taxes is governed by equitable principles, a plaintiff who challenges the validity of a tax may recover only if it be shown that more has been exacted than in equity and good conscience should have been paid. (*Northrop Aircraft Inc.* v. *California Emp. Stabilization Com.,* 32 Cal.2d 872, 879 [198 P.2d 898].) This principle was invoked and applied in *Simms* v. *County of Los Angeles,* 35 Cal.2d 303 [217 P.2d 936].) At page 316 the court observed that 'the rule operates to limit recovery to the difference between the tax actually paid and that which properly should have been exacted, and to prevent recovery if the taxpayer paid only his fair and just proportion of taxes.' "; *First Trust etc. Bank* v. *County of Los Angeles, supra,* 206 Cal. 240, 242, where it is said: "Technically, the position of respondent is sound, but this is an action in equity, and as stated in *Steele* v. *San Luis Obispo,* 152 Cal., at page 787 [93 P. 1021] : 'The rules based upon the maxim that he who seeks equity must do equity are applicable in suits to recover taxes paid. The idea upon which such a suit is predicated is that the county or municipality has received that which in justice it ought not to retain, and, therefore, when the proceedings have been merely irregular, the action

will not lie.' ''; and *Ambassador Hotel Corp.* v. *County of Los Angeles,* 94 Cal.App. 143, 148 [270 P. 726], where the court stated: ''. . . as there has been no complaint made that the value of the hotel, as ascertained by the assessor, was excessive, no legal cause of action is set forth. ▉ In order for the plaintiff to have been injured, the plaintiff must have been required to pay taxes in excess of that which it should have paid, not merely that by reason of an error in computation made by the assessor it was required to pay more than otherwise would have been the case.

''The answer to plaintiff's contention may be stated in a different manner: If the assessed valuation of plaintiff's property is not greater than it should have been, the plaintiff has not been legally injured because, perchance, it might have been relieved of the payment of some of its taxes had the assessor not committed the alleged mistake.''

In *Parr-Richmond Industrial Corp.* v. *Boyd, supra,* 43 Cal.2d 157, 164, it was noted: ''The trial court deducted the taxes which it found Parr should have paid on its possessory interest from the amount paid under protest and entered judgment for the difference against the respective county and city defendants.''

### Conclusion

There is no observable tendency in recent decisions to recognize a policy that the Board of Equalization be circumvented so as to permit direct access to the courts in matters cognizable by the board.

In *Star-Kist Foods, Inc.* v. *Quinn,* 54 Cal.2d 507, 511 [6 Cal.Rptr. 545, 354 P.2d 1], the Supreme Court said: ''Star-Kist, however, could have obtained relief by paying its taxes under protest and suing for recovery thereof (Rev. & Tax. Code, § 5136 et seq.), and in such an action any question of valuation pursuant to section 107.1 would be determined by remand to the board of equalization. (See *Forster Shipbuilding Co.* v. *County of Los Angeles, ante,* pp. 450, 460 [6 Cal. Rptr. 24, 353 P.2d 736].)''

The plaintiff has admitted during the trial that the petition filed with the Board of Equalization had been voluntarily withdrawn. There does not remain any proceeding to be remanded to that board.

The judgment is reversed with directions to enter judgment in favor of defendant.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied July 21, 1967, and respondent's petition for a hearing by the Supreme Court was denied September 7, 1967.