MARSH WALL PRODUCTS, INC. (a Corporation), Appellant, v. COUNTY OF LOS ANGELES et al., Respondents.

E. Talbot Callister and Richard F. Oetting for Appellant.

Harold W. Kennedy, County Counsel, and Alfred Charles DeFlon, Deputy County Counsel, for Respondents.

FORD, J.—This is an appeal from a judgment denying recovery of taxes paid under protest.

In its complaint, the plaintiff alleged that on the first Monday in March 1957, it had in its warehouse in the city of Los Angeles "certain merchandise and inventory of the value on said date of the sum of $89,282.18," which fact was set forth in the personal property affidavit filed by it with the tax assessor. It was further alleged that that was "the total amount of the inventories owned, possessed or controlled by plaintiff as of that date," but that the tax assessor "did assess to plaintiff personal property consisting of inventories in the sum of $100,000.00, as of the first Monday in March, 1957." The principal ground upon which the appellant sought a recovery of that part of the taxes which had been paid under protest was that "the total amount of the tax so assessed to plaintiff was excessive in that it was based, in part, upon personal property which was not in existence on the first Monday in March, 1957," in part upon personal property not owned by it on that date, and in part upon personal property not situated within the county of Los Angeles on that date.

At the trial of the matter, it was the position of the respondents that the claim asserted by the appellant was one of overvaluation of property by the assessor and that no recovery could be had because the appellant had not first pursued its administrative remedy before the county board of equalization.[1] The soundness of that position in the light of the pertinent facts is the basic question presented on this appeal. A summary of the evidence presented to the trial court will be given.

May Waner, a deputy assessor, testified that the assessed value placed by her on property was approximately 50 per cent of its market or cash value as determined by her. She

[1]Section 1603 of the Revenue and Taxation Code is: "Annually, on the first Monday in July, the board of supervisors shall meet as the county board of equalization to equalize the assessment of property on the local roll. It shall continue in session for that purpose, from time to time, until the business of equalization is disposed of, but not later than the third Monday in July."

believed that she first talked to Mr. Crampton of Marsh Wall Products, Inc., sometime in April of 1957, but did not then place any value on the merchandise and inventory. She was in the warehouse at least three times. She noticed no material change in quantities of merchandise and inventory from one occasion to the other. On May 27, 1957, she was at the appellant's premises and went through the warehouse. On that date she reached a determination that the assessed value of the merchandise and inventory was $100,000, the cash or market value being ascertained to be at least $200,000. She described that property as consisting of a product in the nature of a finished wallboard, which was in sheets piled in stacks in the warehouse. There were a "great many" stacks. She had no figures as to the total footage of the inventory, but she had the personal property affidavit which the appellant had filed. The office manager told her that from time to time a report was made to the insurance company as to the inventory and that the minimum insurance coverage was never under $200,000. The warehouse foreman told her that they tried to turn their stock every four months. The personal property affidavit stated that the gross sales for the year 1956 were $661,891 in amount, and that the gross profit was 10 per cent. In determining the assessed value to be $100,000, she used the information to which she testified, including that in the personal property affidavit, as well as what she saw in viewing the property. As to her use of the figures contained in the affidavit, her testimony was: "Q. In other words, if they had an inventory of, a market value or full cash value of $89,282 on their premises as of the first Monday of March and if they had average inventory of that amount, they would have a stock turnover based on their cost of sales of 6.6; is that correct? A. Yes. Q. Now, is the stock turnover of 6.6 practicable? Have you ever encountered such a high rate of stock turnover? A. No, I have not in that type of business; never."

Edgar C. Crampton, who was manager of the Los Angeles office of the appellant, testified that the head office of the appellant was in Dover, Ohio. The appellant's business consisted of the manufacture and sale of prefinished wall panels. On February 25, 1957, a physical inventory was taken in the Los Angeles warehouse under his supervision and direction. The valuation so reached was $89,282.18. After the first Monday in March 1957, substantial amounts of merchandise and inventory were received from the East. Much of that stock

was in the warehouse in May. He further testified that the transactions with respect to insurance coverage on merchandise and inventory were handled by the office in Ohio; the Los Angeles office dealt with none of the details with respect thereto and no one there had anything to do with that matter. The reference to 10 per cent in the personal property affidavit related to "the handling charge that we must make on materials going through the warehouse" and was not as to the gross profit on the sale of appellant's products, the latter figure being 55 per cent. The witness also testified as follows: "Q. What practice if any did you follow with respect to the amount of inventory handled on that date? A. We normally started in the holiday season, November, to reduce our inventory to a[n] absolute minimum so that as of the first Monday in March we would be at our lowest inventory figure. Q. Would the inventory on hand on the tax date be representative of the average inventory handled during the year? A. No. Q. In the years that you had this warehouse since 1951, Mr. Crampton, to your knowledge what is the highest inventory in these wall panels you had in your warehouse? A. About one hundred and twenty, twenty-five thousand." The warehouse foreman employed in 1957 had nothing to do with the inventory records or the records as to sales and profits; such records were not made available to him.

 The governing law is stated in *Star-Kist Foods, Inc.* v. *Quinn*, 54 Cal.2d 507, at pages 509-510 [6 Cal.Rptr. 545, 354 P.2d 1], as follows: "Ordinarily a taxpayer seeking relief from an erroneous assessment must exhaust available administrative remedies before resorting to the courts. [Citations.] Prior application to the local board of equalization has not been required, however, in certain cases where the facts were undisputed and the property assessed was tax-exempt [citations], outside the jurisdiction [citation], or nonexistent [citations]. . . . The necessity of recourse to the board is properly determined by the nature of the issues in dispute, and not by whether an assessment is attacked in part or *in toto*. [Citations.]" (See also *Parr-Richmond Industrial Corp.* v. *Boyd*, 43 Cal.2d 157, 164 [272 P.2d 16]; *Bank of America* v. *Mundo*, 37 Cal.2d 1, 4 [229 P.2d 345]; *Security-First Nat. Bank* v. *County of Los Angeles*, 35 Cal.2d 319, 320-321 [217 P.2d 946]; *Stafford* v. *County of Riverside*, 155 Cal. App.2d 474, 476-477 [318 P.2d 172].)

The proper evaluation of property of the nature of that involved in the case now before the court may present a difficult problem for the assessor. As said in *Rittersbacher* v. *Board of Supervisors,* 220 Cal. 535, at page 544 [32 P.2d 135] : "With reference to a stock in trade it is obviously impracticable, if not impossible to take an inventory and evaluate each article." It is, of course, not necessary that the assessor actually view the property on the day as of which its value is to be determined. ▮▮ In *Montgomery Ward & Co.* v. *Welch,* 17 Cal.App.2d 127, at page 130 [61 P.2d 790], the court said: "Ordinarily an assessment is not invalidated by the fact that the assessor did not actually inspect the property if, from other sources, he had sufficient knowledge or evidence of its existence and value."

▮▮ In the present case it is clear that the assessor's efforts, whether or not skillfully pursued, were directed to the determination of the value as of the first Monday in March 1957, of a particular unit of the appellant's property, namely, its inventory of merchandise located in its Los Angeles warehouse. While the amount of the appellant's property physically on hand as of that date had a direct relationship to the matter thus sought to be determined by the assessor, it is clear that the nature of the problem is predominantly one of valuation. Such a problem is of a different character than, for instance, the problem discussed in *Parrott & Co.* v. *City & County of San Francisco,* 131 Cal.App.2d 332 [280 P.2d 881], where property exempt from taxation formed a unit clearly segregated from the property of the taxpayer which was subject to tax. There the taxpayer was not required to exhaust his remedies before the county board of equalization for reasons expressed by the court at page 342 as follows: "There was nothing for the administrative board to adjudicate. The function of a County Board of Equalization, as its name implies, is to increase or lower an assessment in order to equalize property assessments on the local rolls, and to make the assessment conform with the true value of the property. (See Rev. & Tax. Code, §§ 1605, 1608.) In the instant case evaluation or revaluation is not involved at all. Here the foreign imports were segregated from the other properties of the taxpayer, and separately assessed. The taxpayers claim, and properly so, that this total assessment was a nullity —beyond the power of the taxing officials to impose. In such a case there is no question of valuation that must be presented

to the Board of Equalization for correction before the judicial review may be sought. (*Parr-Richmond Industrial Corp.* v. *Boyd,* 43 Cal.2d 157, 165 [272 P.2d 16].)''

The case now before the court involves the determination of the value of a unit of property clearly subject to tax. As heretofore noted, consideration of the physical size of such a unit is a part of the process of making a determination of the value thereof. Unlike the situation in *Star-Kist Foods, Inc.* v. *Quinn, supra,* 54 Cal.2d 507, where a question of constitutional law was presented, the problem in the present case is (to borrow the language of the Star-Kist case found at page 511 thereof) one ''of valuation that the local board of equalization had special competence to decide.'' The problem is akin to that considered to *Montgomery Ward & Co.* v. *Welch, supra,* 17 Cal.App.2d 127, wherein an attack was made by the taxpayer upon the determination of the assessed value of taxable property in a warehouse which assessed value greatly exceeded the amount which was stated to be the full cash value thereof in the taxpayer's statement submitted to the assessor. The taxpayer made no application to the board of equalization for a reduction in the valuation placed upon the property by the assessor. It was the taxpayer's contention that it had removed all the property from the warehouse before the time the assessor actually made the assessment and that the assessor had arbitrarily assumed that the warehouse contained approximately the same quantity of goods as had been therein on the first Monday of March of the previous year. The appeal was from a judgment on the pleadings in favor of the defendants. In affirming that judgment, the court said, at pages 133-134: ''The case before us is purely that of a claimed overvaluation of the property and is not one of a double, erroneous or illegal assessment which is entirely void. . . . Our system provides a method of reviewing the values fixed by the assessor and a tribunal to pass upon any claims of overvaluation. If that tribunal fails to properly discharge its duty the courts may intervene, but a different situation is presented where a taxpayer fails to avail himself of the machinery provided and fails to make timely application to and make proof of his contentions before the board of equalization. Under the statutes and the authorities above referred to we conclude that an application for relief to the board of equalization is a necessary prerequisite to the maintenance

of such an action as this, and that the complaint filed by the appellant failed to state a cause of action.''

The judgment is affirmed.

Bishop, J. pro tem.,* concurred.

Vallée, Acting P. J., dissented.

[Civ. No. 24827. Second Dist., Div. Three. June 13, 1961.]

*Assigned by Chairman of Judicial Council.