Filed 11/21/22 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BARBARA MORGAN et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>YGRENE ENERGY FUND, INC. et al.,<br><br>    Defendants and Respondents. | D079364<br>(Super. Ct. No. 37-2019-00052045-CU-OR-CTL)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br><br>**NO CHANGE IN JUDGMENT** |
| JANET ROBERTS et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>RENEW FINANCIAL GROUP, LLC et al.,<br><br>    Defendants and Respondents. | D079369<br>(Super. Ct. No. 37-2019-00059601-CU-OR-CTL) |

THE COURT:

It is ordered that the opinion filed November 1, 2022 be modified as follows:

1. On page 10, at the end of the top paragraph, after the words " 'and possibly the entire balance if the violation is found to have been "willful," ' " add the following sentence:

> In what plaintiffs have styled as their "fourth cause of action" alleging violations of Financial Code section 22750, and the "fifth cause of action" invoking Business and Professions Code section 7159.2, plaintiffs seek "public injunctive relief"—that is, an order (1) prohibiting defendants from "engaging in the business of making consumer loans unless and until each is property licensed as a Finance Lender," and (2) requiring each program administrator to include a joint check requirement in any future agreement.

2. The last paragraph on page 14 and ending on page 15, after the words " 'No other persons may bring such an action . . . .' (*Ibid*.)"—insert the following paragraph:

> This same analysis applies to what plaintiffs have labeled as their fourth and fifth causes of action for public injunctive relief. The underlying premise of each is that defendants are either sellers of home improvement services or are engaged in the business of making loans. Public injunctive relief is, as its name suggests, a remedy, not a theory of liability. These remedial requests are based on the same legal theories, arise from the same alleged operative facts, and involve the same alleged primary rights as the first three causes of action. The only difference is the nature of the remedy sought. (See *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 961 [public injunctive relief is a remedy under the Unfair Competition Law].) "Injunctive relief is a remedy, not a cause of action. [Citations.] A cause of action must exist before a court may grant a request for injunctive relief." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 65.) Here, because the first three causes of action fail as a matter of law, the fourth and fifth, seeking additional remedies, necessarily fail as well.

2

The petition for rehearing is denied.

There is no change in judgment.

McCONNELL, P. J.

Copies to:  All parties

Filed 11/1/22 (unmodified opinion)
CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| BARBARA MORGAN et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>YGRENE ENERGY FUND, INC., et al.,<br><br>    Defendants and Respondents. | D079364<br><br><br><br>(Super. Ct. No. 37-2019-00052045-CU-OR-CTL) |
| JANET ROBERTS et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>RENEW FINANCIAL GROUP, LLC, et al.,<br><br>    Defendants and Respondents. | D079369<br><br><br><br>(Super. Ct. No. 37-2019-00059601-CU-OR-CTL) |


APPEALS from judgments of the Superior Court of San Diego County, Richard S. Whitney, Judge. Judgments affirmed. Requests for judicial notice denied.

James Swiderski for Plaintiffs and Appellants.

Buckley, Fredrick S. Levin and Ali M. Abugheida for Defendants and Respondents Ygrene Energy Fund, Inc., GoodGreen 2016-1, GoodGreen 2017-1, GoodGreen 2017-2, GoodGreen 2018-1, GoodGreen 2019-1, GoodGreen 2015 LLC, GoodGreen 2016-1 LLC, GoodGreen 2016-1 Trust, GoodGreen Holdings 2016-A Trust, GoodGreen 2017-1 Trust, GoodGreen Funding 2016-1 LLC, GoodGreen Funding 2017-1 LLC, GoodGreen 2017-2 LLC, GoodGreen Funding 2017-R1 LLC, GoodGreen Funding 2018-1 LLC, GoodGreen Holdings 2016-A Trust, Renew Financial Group LLC, Renew 2017-1, Renew 2017-2, and Renew 2018-1.

Reed Smith, Jesse L. Miller, David J. de Jesus and Emily F. Lynch for Defendants and Respondents Wilmington Trust, N.A., as Trustee of Hero Funding Trust 2015-2, Hero Funding Trust 2015-3, Hero Funding Trust 2016-1, Hero Funding Trust 2016-2, Hero Funding Trust 2017-1, Hero Funding Trust 2017-3, and Hero Funding Trust 2018-1.

Akin Gump Strauss Hauer Feld and Neal R. Marder for Defendants and Respondents Golden Bear 2016-1, LLC, Golden Bear 2016-2, LLC, and Golden Bear 2016-R, LLC.

The issue in these consolidated appeals is not an unfamiliar one—whether plaintiffs were required to first exhaust administrative tax remedies before filing this lawsuit. But it arises in a novel context where property tax and home improvement financing intersect.

In 2008, California enacted a Property Assessed Clean Energy program (PACE) as a method for homeowners to finance energy and water conservation improvements. Like an ordinary home equity loan, a PACE debt is created by contract and secured by the improved property. But like a tax, the installment payments are billed and paid as a special assessment on the improved property, resulting in a first-priority tax lien in the event of default.

The named plaintiffs in these putative class actions are over 65 years old and entered into PACE contracts. Barbara Morgan, for example, borrowed over $100,000 for "reflective coating" and "energy efficient" windows. Her resulting 20-year special tax assessment bears 8.49 percent interest, increasing her property taxes by nearly $15,000 annually. Similarly, plaintiff John Brown borrowed over $100,000 for a new air conditioner, a "cool roof," and "permeable ground cover," a fancy name for concrete pavers. The annual percentage rate on his PACE loan is 9.29 percent. His property taxes increased by over $11,400 annually for 20 years.

The defendants are private companies who either made PACE loans to the plaintiffs, were assigned rights to payment, and/or administered PACE programs for municipalities. The gravamen of the complaint in each case is that PACE financing is actually, and should be treated as, a secured home improvement loan. Plaintiffs allege that defendants engaged in unfair and deceptive business practices by violating consumer protection laws, including

3

Civil Code section 1804.1 subdivision (j), which prohibits taking a security interest in a senior citizen's residence to secure a home improvement loan.

The liability theories are intriguing, but we need not and do not address them here. The appeals turn instead on a procedural issue. Generally, a taxpayer may not pursue a court action for a refund of property taxes without first applying to the local board of equalization for a reduction and then filing an administrative claim for a refund. (Rev. and Tax. Code,[1] §§ 1603, 5097; see *Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1307–1308 (*Steinhart*).) "[S]trict legislative control over the manner in which tax refunds may be sought is necessary so that government entities may engage in fiscal planning based on expected tax revenues." (*Woosley v. State of California* (1992) 3 Cal.4th 758, 789.)

Here, defendants demurred to the complaints on the sole ground that plaintiffs failed to allege they first exhausted administrative remedies. The trial court agreed, sustained the demurrers without leave to amend, and entered a judgment of dismissal in each case.

On appeal, plaintiffs primarily contend they were not required to pursue administrative remedies because they have sued only private companies and do not challenge "any aspect of the municipal tax process involved." (Italics omitted.) But as we will explain, the complaints seek tax refunds, an injunction against future tax assessments, and removal of tax liens. Despite their assertions to the contrary, plaintiffs do challenge their property tax assessments. And although they have not sued any government entity, the "consumer protection statutes under which plaintiffs brought their action cannot be employed to avoid the limitations and procedures set out by

---

[1]	Undesignated statutory references are to the Revenue and Taxation Code.

4

the Revenue and Taxation Code." (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1092 (*Loeffler*).)

Plaintiffs also contend that the exhaustion rule should not apply because their liability theories involve legal issues that an assessor's board lacks expertise to resolve. The Legislature, however, has given such boards " 'jurisdiction over nonvaluation issues.' " (*Williams & Fickett v. County of Fresno* (2017) 2 Cal.5th 1258, 1271 (*Williams & Fickett*).) Thus, we conclude that plaintiffs were required to submit their claims through the administrative appeals process in the first instance. Their failure to do so requires the judgments to be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Because the appeals challenge a judgment of dismissal entered upon the sustaining of a demurrer without leave to amend, we draw the operative facts from the complaints. (*Steinhart*, *supra*, 47 Cal.4th at p. 1304, fn. 1.)

A. *PACE Programs*

In 2008, the Legislature determined that promoting energy efficient improvements to real property was "necessary to address the issue of global climate change." (Stats. 2008, ch. 159 (Assem. Bill No. 811) § 2; Former Sts. & Hy. Code, § 5898.14, subd. (a)(1).) Recognizing that the cost "prevents many property owners from making these improvements," it authorized "the legislative body of any city" to "finance" the installation of energy efficiency improvements that are permanently affixed to real property. (Former Sts. & Hy. Code, § 5898.14 (Stats. 2008, ch. 159, § 2).) The Legislature envisioned that municipalities would borrow money by selling bonds to private investors. In turn, local government would lend the money to homeowners, who would use it to pay contractors for installing energy and/or water conservation

5

upgrades.  (Sts. & Hy. Code, § 5898.22, subd. (d).)  The PACE loan would be repaid by an assessment added to the homeowner's annual property tax bill, and thus secured by a priority tax lien that runs with the land.

As enacted in 2008, PACE seemingly offered many benefits for homeowners.  Expensive improvements, such as solar energy panels could be purchased with no down payment.  And because the maximum amount financed would be based on the property's value—not the borrower's net income or ability to repay—there was no need to verify employment or require good credit.  PACE offered other benefits too.  Anticipated energy savings were expected to at least in part offset the increase in property tax, and the improvements were expected to increase the property's market value.

When it first enacted PACE, the Legislature anticipated that local governments would operate their own programs, as they did with other aspects of municipal finance.  This may explain why the 2008 legislation "did not provide any mechanism for disclosure of loan terms or regulation of the conduct of lenders."

But despite the public financing envisioned, private companies (with profit motives) soon offered turn-key solutions to local governments interested in establishing a PACE program.  These companies, known as PACE program administrators (Administrators), contracted with local governments to handle the program on their behalf.  Administrators screen contractors to work under the program, ensure construction permits are obtained, spot check the work, set price guidelines and, working through the contractors, solicit homeowners to borrow.  In short order, Administrators were running almost all of the PACE programs throughout the state.

Administrators market municipal bonds to third parties, the proceeds of which fund the home improvements. Alternatively, Administrators buy the municipal bonds themselves—in effect becoming the PACE lender too.

The complaints allege that each of the Administrator/defendants "chose the more lucrative option of buying all of the bonds itself." Plaintiffs maintain that in economic substance, this is a two-party transaction consisting of the homeowner/borrower and the Administrator/lender. According to the complaints, the only difference between this type of financing and an ordinary home improvement loan is that the PACE debt is in the form of a municipal bond instead of a promissory note.[2] The economic reality is that government does not fund the project or otherwise provide any financial subsidy. It is involved solely to provide tax exempt interest for investors who purchase the bonds and thereby fund the private work. Essentially, the government's issuance of bonds provides a " 'conduit' " for private financing to " 'pass through' " to the recipient of the bond proceeds. (See *California Statewide Communities Development Authority v. All Persons Interested etc.* (2007) 40 Cal.4th 788, 794.) According to the complaints, "In bond parlance, this has long been recognized to be indistinguishable, in substance, from a two-party loan, one lender, one borrower." Plaintiffs insist

---

[2] Why finance through a municipal bond and not a promissory note from homeowner to lender? Because interest payments on municipal bonds are generally tax exempt, making it an attractive investment (as well as giving borrowers the benefit of a lower interest rate). Moreover, because the debt is secured by a property tax lien, "the PACE bondholders are able to default the homeowner on their missing a single payment and commence foreclosure proceedings promptly thereafter."

7

that, in substance, "the PACE loans were privately funded home improvement loans, consumer loans in every sense of the word."[3]

B.    *The Morgan and Roberts Complaints*

In 2020, Barbara Morgan, Marcia Bordine, and Arlene Hill filed a first amended putative class action complaint against Renovate America, Inc., Ygrene Energy Fund, LLC, and Renew Financial Group, LLC (collectively Lenders), which they allege are "engage[d] in the business of lending money for the purpose of financing home improvement loans" and acted as Administrators (the Morgan Complaint).  Plaintiffs further state they are each over the age of 65, and were "solicited and signed up for home improvement services" with financing provided by Lenders.  They maintain that "[e]ach was confused by the process, and did not comprehend that they would be putting their homes in jeopardy by agreeing to unaffordable loan obligations that they had no hope of being able to pay off according to the terms of repayment."[4]  In a separate action and represented by the same

_____

[3]    The Complaint acknowledges that since PACE's inception in 2008, "efforts were made to reform the program."  Most recently in 2019, for example, the Legislature prohibited PACE program administrators from approving an assessment contract without first making a "reasonable good faith determination that the property owner has a reasonable ability to pay the annual payment obligations for the PACE assessment."  (Fin. Code, § 22686.)

[4]    The Morgan Complaint also names as defendants:  Ygrene Energy Fund, Inc., GoodGreen 2016-1, GoodGreen 2017-1, GoodGreen 2017-2, GoodGreen 2018-1, GoodGreen 2019-1, GoodGreen 2015 LLC, GoodGreen 2016-1 LLC, GoodGreen 2016-1 Trust, GoodGreen Holdings 2016-A Trust, GoodGreen 2017-1 Trust, GoodGreen Funding 2016-1 LLC, GoodGreen Funding 2017-1 LLC, GoodGreen Funding 2017-2 LLC, GoodGreen Funding 2017-R1 LLC, GoodGreen Funding 2018-1 LLC, and GoodGreen Holdings 2016-A Trust.  Morgan and Bordine allege that their repayment obligations

8

lawyer who filed the Morgan Complaint, another group of plaintiffs, Janet Roberts, Alfonso Robinson, John Brown, Joan Banks, Lyn Ramskill, and Evigildo Lamitar, filed a virtually identical lawsuit against Renew Financial Group, LLC and several "Renew" and "Golden Bear" entities they allege "came to own security interests" in plaintiffs' homes.[5]

The complaints do not allege fraud. Nor do plaintiffs challenge the quality of the improvements their PACE loans purchased. Rather, plaintiffs allege they were "confused about the terms of the loans they were being solicited for" and did not appreciate "the financial burden that would result" and the risk of foreclosure.

Plaintiffs assert causes of action under the Unfair Competition Law based on alleged violations of (1) Civil Code section 1804.1, subdivision (j) [prohibiting taking a security interest in a senior citizen's home under a home improvement contract]; (2) Civil Code section 1803.2 [failing to admonish, "IF YOU SIGN THIS CONTRACT, YOU WILL BE PUTTING UP YOUR HOME AS SECURITY"]; (3) Financial Code section 22750 [requiring a finance lender license]; and (4) Business and Professions Code section 7159.2 [requiring contractors to be paid by joint check]. They claim that as a result of these violations, Lenders are prohibited from collecting interest, finance

---

were assigned to one of more of these defendants "as part of a common plan of sequential securitization of the loan receivable."

Hill also sued Renovate America, Inc. and named as additional defendants: Wilmington Trust, NA, as Trustee of Hero Funding Trust 2015-2; Hero Funding Trust 2015-3; Hero Funding Trust 2016-1; Hero Funding Trust 2016-2; Hero Funding Trust 2016-3, 2016-4, 2017-1; Hero Funding Trust 2017-2; Hero Funding Trust 2017-3; Hero Funding Trust 2018-1.

[5] Specifically, these defendants are Renew 2017-1, Renew 2017-2, Renew 2018-1, Golden Bear 2015-1, LLC , Golden Bear 2016-1, LLC, Golden Bear 2016-2, LLC, and Golden Bear 2016-R, LLC.

charges, "and possibly the entire balance if the violation is found to have been 'willful.' "

## C.    *The Demurrers and Ruling*

In December 2020 the defendants demurred to both the Morgan and Roberts complaints on the grounds that plaintiffs failed to "exhaust administrative remedies."[6]  The trial court sustained the demurrers without leave to amend and entered a judgment of dismissal in each of the actions. On defendants' unopposed motions, we consolidated the two appeals for argument and decision.

## DISCUSSION

## A.    *Plaintiffs Were Required to Exhaust Administrative Remedies*

Generally, " 'a party must exhaust administrative remedies before resorting to the courts.' " (*Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 383.)  This rule advances two policies.  It allows an agency to decide matters within its expertise without court interference.  (*Ibid.*) Second, administrative proceedings "aid[ ] judicial review by allowing the agency to draw upon its expertise and develop a factual record for the court's consideration."  (*Ibid.*)  Even where the administrative remedy " 'may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor 'because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency." ' " (*Sierra Club v. San Joaquin Local Agency Formation Commission* (1999) 21 Cal.4th 489, 501.)

---

6    Defendants sued by Hill and those sued by Morgan and Bordine filed separate demurrers raising the same issues.  The court resolved both demurrers in a single minute order.

10

The California Constitution gives the Legislature exclusive control over the procedure under which a taxpayer may recover certain tax payments. Article XIII, section 32 provides: "After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature."[7] It also specifies that "[t]he Legislature shall pass all laws necessary to carry out [its] provisions." (Cal. Const., art. XIII, § 33.)

The county assessor is responsible for preparing the local tax roll and assessing all taxable property in the county. (§ 401.) Taxpayers have the right to challenge an inaccurate or illegal tax assessment and to claim a refund of taxes. The county board of supervisors meeting as a board of equalization, or an assessment appeals board (board) hears those challenges. (§§ 1601, subd. (a), 1603.)

The process is initiated by an application for assessment reduction under section 1603, subdivision (a), which provides: "A reduction in an assessment on the local roll shall not be made unless the party affected . . . files with the county board a verified, written application showing the facts claimed to require the reduction and the applicant's opinion of the full value of the property." Under section 1610.8, the board may "cancel[ ] improper assessments." An order for refund cannot be made unless a verified claim is filed under section 5097. The taxpayer may file an action in the

---

7     Although by its terms, the California Constitution, article XIII, section 32 applies to state-imposed taxes (see *Conolly v. County of Orange* (1992) 1 Cal.4th 1105, 1114; but see *Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946, 962), it has been held to also apply to local taxes as a matter of public policy. (*California State University, Fresno Assn., Inc. v. County of Fresno* (2017) 9 Cal.App.5th 250, 262.)

superior court to recover a tax that the board has refused to refund after a duly filed claim. (§ 5140.)

Here, the complaints do not allege (and apparently cannot be amended to allege) compliance with these statutes. Plaintiffs contend, however, that they were not required to do so because they have sued private entities and "do[ ] not . . . challenge any aspect of the municipal tax process involved . . . ." Relying on *Oakland v. California Construction Co.* (1940) 15 Cal.2d 573 (*Oakland*), plaintiffs assert that a "request by private party property owners for the return of money paid out on a void contractual obligation [is] not a challenge to an assessment lien" and, therefore, does not require that they first exhaust administrative remedies.

These arguments fail because they mischaracterize the complaints. For purposes of applying the exhaustion rule, the PACE assessments can only be treated as taxes. This is because PACE assessments are collected "in the same manner as ordinary ad valorem property taxes are collected." (Gov. Code, § 53340, subd. (e).) Under Revenue and Taxation Code section 4801, "taxes" include "assessments collected at the same time and in the same manner as county taxes." (§ 4801; see *Kahan v. City of Richmond* (2019) 35 Cal.App.5th 721, 737 [administrative procedure for seeking a tax refund applies to garbage collection fees that are collected at the same time and manner as county property taxes].)

Moreover, plaintiffs seek injunctive relief (1) requiring "property tax payments" to "municipal taxing authorities" as "PACE tax assessments" to be "released back" to each property owner; and (2) prohibiting defendants from initiating collection procedures on delinquent accounts. Plaintiffs ask that these orders remain in place until defendants successfully "request[ ] that the local governments remove the voluntary tax assessments on the properties."

12

Using "released back" instead of "refund" does not change the objective reality that plaintiffs seek court orders to cancel property tax obligations and obtain a refund of taxes they have already paid.

We also find the Supreme Court's decision in *Oakland* to be materially distinguishable. That case did not involve a challenge to any tax. Rather, the city of Oakland sought to void street improvement contracts based on a contractor's alleged fraud during the bidding process. (*Oakland, supra*, 15 Cal.2d at pp. 574–575.) The work was financed by a special assessment on the properties benefited by the improvement. The defendants in *Oakland* asserted that the action was time-barred under a 30 day period for challenging special property tax assessments. (*Id*. at p. 578.) The Supreme Court rejected that argument because the city was not seeking to void any tax assessment, but rather the contract for the work of improvement. (*Ibid*.)

Thus, *Oakland* holds that a government entity can seek to void a public works contract between itself and a contractor without challenging the tax assessments that were made to pay for it. But here, plaintiffs are not governmental entities. And they *are* challenging their tax assessments—they want the assessment cancelled and tax payments refunded. Indeed, they allege that defendants' statutory violations render "void any security interest" in plaintiffs' homes—i.e., the property tax liens.

In a related argument, plaintiffs contend that the exhaustion rule only applies to lawsuits against government. Because they seek restitution of tax payments remitted to private entities, plaintiffs maintain there are simply no administrative remedies to exhaust. They find support for this view in section 5140, which provides that the "person who paid the tax" is authorized to bring a refund action against "a county or a city" to recover tax the county or city has refused to refund. By negative implication, they argue that since

13

they are not suing "a county or a city," the administrative refund process does not apply.

This argument is undermined if not foreclosed by the Supreme Court's decision in *Loeffler*. In that case, the court held that consumers had to first exhaust administrative tax remedies before bringing an action under the Unfair Competition Law to challenge a retailer's alleged misrepresentation about whether a sale of hot coffee was subject to sales tax. (*Loeffler*, 58 Cal.4th at pp. 1092, 1134.) The *Loeffler* plaintiffs asserted they were not required to exhaust administrative remedies because they were not suing the government, nor were they seeking a tax refund.[8] (*Loeffler*, at p. 1102.) The Supreme Court disagreed, explaining that the question of taxability had to be first decided administratively, followed by judicial review of the agency's decision. (*Id*. at p. 1127.) An injunction prohibiting retailers from collecting sales tax "could indirectly reduce the flow of tax revenue in the future" and thus involved policies the exhaustion rule was intended to address. (*Id*. at p. 1131.)

Similarly here, plaintiffs' PACE assessments undoubtedly would be affected by the adjudication of the complaints. They allege that the PACE loans are "void at inception for illegality" and the resulting security interest (i.e., a property tax lien) is also unlawful and "void." Because the tax rests exclusively upon the validity of the PACE financing, a judgment that the debt and security interest are illegal and void would seem to negate the sole basis of the tax assessment. Under *Loeffler*, it is the nature of the relief sought and the availability of an administrative remedy to achieve it—not whether the

---

8      The legal incidence of sales tax is on the seller, not the consumer. (See *First American Title Ins. Co. v. California Dept. of Tax & Fee Administration* (2021) 71 Cal.App.5th 603, 611.)

14

defendant is a private or public entity—that triggers the exhaustion rule. Here, the net result or effect of the liability theories in the complaints would be to absolve plaintiffs of a tax liability (although not a contractual liability).[9] Because an administrative procedure exists to resolve that issue in the first instance, plaintiffs were required to invoke it. Moreover, contrary to plaintiffs' contention, section 5140 addresses standing, not exhaustion. It provides in part: "The person who paid the tax . . . may bring an action only in the superior court . . . against a county or a city to recover a tax which the board of supervisors . . . has refused to refund on a claim . . . . No other person may bring such an action . . . ." (*Ibid.*)

B.    *Plaintiffs Have Not Alleged Facts Triggering An Exception*[10]

Even if exhaustion of administrative remedies is generally required, a second question is whether the facts alleged in the complaints, deemed true on demurrer, trigger an exception to the exhaustion requirement. Plaintiffs ask us to apply a broad exception to exhaustion on the grounds that "no purpose would be served" by requiring the board to consider a pure legal issue—whether consumer protection statutes apply to these PACE loans.

A limited exception to the exhaustion rule has generally been recognized where " 'the administrative agency cannot provide an adequate remedy' and 'when the subject of a controversy lies outside the agency's

---

[9]    Whether a judgment in this case would have claim or issue preclusion effect in some other action is not before us and we express no opinion on it. We merely acknowledge the practical reality of a potential final judgment determining the tax liens are illegal and void.

[10]    After oral argument, we asked the parties to file additional briefs, which we have considered, on whether the complaints allege facts triggering any exception to the exhaustion rule.

jurisdiction.' " (*Williams & Fickett*, *supra*, 2 Cal.5th at p. 1274.) But in this case, an adequate remedy does exist. By statute, the board "shall" refund property tax that is erroneously or illegally assessed. (§ 5096, subds. (b), (c).)

Plaintiffs are correct that "the central responsibility of county boards is to decide questions of valuation." (*Williams & Fickett*, *supra*, 2 Cal.5th at p. 1269.) But the board's jurisdiction extends to nonvaluation issues as well. (*Id*. at p. 1270.) This authority is manifest in section 5142, which provides that a taxpayer may avoid the assessment appeal process if they and the assessor stipulate that "only nonvaluation issues" are involved. If the board accepts this stipulation, it "shall be deemed compliance" with the requirement to exhaust administrative remedies. (§ 5142, subd. (b).) This stipulation process "would be meaningless . . . if an exhaustion requirement did not apply to nonvaluation issues." (*Williams & Fickett*, at p. 1271.)

Another exception to the exhaustion rule—the so-called nullity exception—has been recognized "specific to tax disputes." (*Williams & Fickett*, *supra*, 2 Cal.5th at p. 1275.) Exhaustion is not required where the assessment " 'is a nullity as a matter of law because, for example, the property is tax exempt, nonexistent or outside the jurisdiction [citations], *and* no factual questions exist regarding the valuation of the property which, upon review by the board of equalization, might be resolved in the taxpayer's favor, thereby making further litigation unnecessary.' " (*Ibid.*, italics added.)

In supplemental briefing, Plaintiffs concede that the nullity exception does not apply in this case. That concession is likely compelled by prior validation judgments that plaintiffs admit "approved the PACE bonds and their validity as tax assessments."[11] Nevertheless, plaintiffs insist that the

---

11    A validation proceeding is used to secure a judicial determination that proceedings by a local government entity, such as the issuance of municipal

16

board lacks "any power or competence" to address the issues raised by their complaints and, therefore, the same policies that underlie the nullity exception dictate a similar exception should be applied here.

We disagree. To be sure, the board has special competence in determining the value of real property. (See *Stenocord Corp. v. City and County of San Francisco* (1970) 2 Cal.3d 984, 988.) But the exhaustion doctrine advances other policies too, such as " 'easing the burden on the court system . . . and providing a more economical and less formal means of resolving a dispute.' " (*Williams & Fickett, supra*, 2 Cal.5th at p. 1268.) It also facilitates developing a complete record and affords a " 'sifting process [citation], unearthing the relevant evidence and providing a record which the court may review.' " (*Ibid*.) Here, for example, plaintiffs allege they "did not comprehend that they would be putting their homes in jeopardy by agreeing" to the PACE assessments and have "no hope of being able to pay off" the taxes. They further allege being victimized by "high pressure sales efforts" from persons acting on defendants' behalf to "peddl[e] the loan products." There are other factual issues on causation, given that plaintiffs admit they were not defrauded and they obtained financing for home improvements they contracted for.

The board, is a "constitutional agency exercising quasi-judicial powers." (See Notes to Decisions, Cal. Const., art. XIII, § 16; *International Medical Systems, Inc. v. Assessment Appeals Bd.* (1997) 57 Cal.App.4th 761, 766.) It is capable of addressing these questions in the first instance. (See *Williams & Fickett, supra*, 2 Cal.5th at p. 1269, fn. 6 [county boards decide "a bevy of

---

bonds, are valid, legal, and binding. " ' "Assurance as to the legality of the proceedings surrounding the issuance of municipal bonds is essential before underwriters will purchase bonds for resale to the public." ' " (*City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 587.)

threshold factual questions that are implicit in any assessment"].) Accordingly, we conclude that the complaint does not allege facts triggering any exception to the exhaustion rule.[12]

C.    *Not a Merits Determination*

Plaintiffs assert that while we "could" reverse the judgment "based on administrative exhaustion" we "should" also rule on whether they have "stated a valid claim" on the merits. But the demurrers were limited to whether plaintiffs had failed to exhaust administrative remedies. So is the order sustaining the demurrers. Any determination of merits would, therefore, be an advisory opinion. (See *Stockton Teachers Assn. CTA/NEA v. Stockton Unified School Dist.* (2012) 204 Cal.App.4th 446, 464, fn. 11 ["An appellate court does not 'inform the litigants what the opinion of the court is upon a question that has not been raised in the action, or what its decision would be if the question should be presented' "]; see also *Crown Oil Corp. v. Superior Court* (1986) 177 Cal.App.3d 604, 613 [appellate review of demurrer limited to issue(s) raised on demurrer].) Whether plaintiffs' substantive claims have merit is not before us, and we express no opinion on such matters.[13]

---

[12]    We also reject plaintiffs' assertion that rather than involving the exhaustion rule, their claims are more appropriately analyzed as "a *primary jurisdiction* challenge." That doctrine applies only in cases " ' "originally cognizable in the courts." ' " (*Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 933.) For reasons explained in the body of this opinion, plaintiffs' claims are not originally cognizable in court.

[13]    Plaintiffs' requests for judicial notice of legislative materials and Department of Corporations documents pertains to the merits and are denied. (See *People v. Doane* (2021) 66 Cal.App.5th 965, 969, fn. 1 [denying request for judicial notice of documents as "unnecessary to our decision"].)

## DISPOSITION

The judgments are affirmed.  Respondents are entitled to costs on appeal.


DATO, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.

---

Defendants' requests for judicial notice of a complaint and judgment in a validation action and other documents are denied on the same grounds.

19