Filed 3/17/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LA LIVE PROPERTIES, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COUNTY OF LOS ANGELES,<br><br>    Defendant and Respondent. | B298278<br><br>(Los Angeles County<br> Super. Ct. No. BC674513)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion in this matter, filed February 26, 2021, is modified as follows:

The first full sentence on p. 20 (immediately following heading II.) is modified to read as follows:  "The parties agree that LA Live did not administratively challenge the escape assessments by filing an application for assessment reduction with the county board pursuant to section 1603."

The petition for rehearing is denied.  There is no change in the judgment.

_____

Edmon, P.J.                    Lavin, J.                    Dhanidina, J.

Filed 2/26/21 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LA LIVE PROPERTIES, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COUNTY OF LOS ANGELES,<br><br>    Defendant and Respondent. | B298278<br><br>(Los Angeles County<br>Super. Ct. No. BC674513) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elizabeth White, Judge (Ret.).  Affirmed.

Ajalat, Polley, Ayoob & Matarese, Richard J. Ayoob, Christopher J. Matarese, Gregory R. Broege and Andrew W. Bodeau for Plaintiff and Appellant.

Lamb and Kawakami LLP, Thomas G. Kelch and Michael K. Slattery; Mary C. Wickham, County Counsel, Peter M. Bollinger, Assistant County Counsel, Richard Girgado and Justin Y. Kim, Deputy County Counsel for Defendant and Respondent.

This is a tax refund action brought by appellant LA Live Properties, LLC (LA Live) against respondent County of Los Angeles (County). In 2012, the County levied "escape assessments"—that is, "retroactive [tax] assessment[s] for years in which property was either not assessed or underassessed" (*Williams & Fickett v. County of Fresno* (2017) 2 Cal.5th 1258, 1265, fn. 2 (*Williams*))—on real property owned by LA Live. After paying the taxes due under the escape assessments, LA Live filed the present action, which seeks a refund of those taxes. LA Live claimed that when the Los Angeles County Assessor (Assessor) reassessed the real property in 2012, he failed to comply with the procedural requirements of Revenue and Taxation Code[1] section 531.8, which required that "Notices of Proposed Escape Assessment" be issued ten days before the escape assessments were enrolled. Instead, the Assessor mailed the notices just five days before enrolling the escape assessments. LA Live contended that because too few days passed between the mailing of the notices and the enrollment of the escape assessments, the assessments were void and subject to refund.

The matter was tried in the superior court, which denied LA Live's claim for a refund. The court found, among other things, that the Assessor's failure to wait 10 days before enrolling the escape assessments did not render them void, and LA Live had failed to exhaust its administrative remedies before pursuing the present action. The court therefore entered judgment for the County.

---

[1] All subsequent undesignated statutory references are to the Revenue and Taxation Code.

2

As we discuss, the trial court correctly concluded that LA Live's claim is not reviewable on the merits because LA Live did not exhaust its administrative remedies. By statute, a taxpayer is required to file administrative requests for reassessment and refund before filing a refund action in court. The administrative exhaustion requirement is jurisdictional unless the assessment is a " 'nullity as a matter of law.' " (*Williams*, *supra*, 2 Cal.5th at p. 1264.) In the present case, the assessment was not legally null: Even if the Assessor failed to follow the statutory procedure set out in section 531.8, that failure did not render the assessment a nullity because the real property at issue was not tax exempt, nonexistent, or outside the County's jurisdiction. We therefore will affirm the judgment for the County.

## STATUTORY FRAMEWORK

*A.      Regular and Escape Assessments*

"The assessors in each of California's 58 counties have the authority—and duty—to levy taxes on all of the property within their boundaries. (Cal. Const., art. XIII A, § 1, subd. (a); § 401.) The amount of the levy is the property's assessed value (referred to as its 'full cash value') multiplied by the applicable, one-percent tax rate." (*Prang v. Los Angeles County Assessment Appeals Board No. 2* (2020) 54 Cal.App.5th 1, 11–12 (*Prang*).)[2]

---

[2]      "When Proposition 13 became law in 1978, the assessed value of real property was redefined as (1) either (a) the value of the property reflected on its '1975–[19]76 tax bill' or, if certain events triggering reassessment occur, (b) the 'appraised value of [the] real property' at the time of the triggering event, plus (2) an 'inflationary rate not to exceed 2 percent for any given year' keyed to the 'consumer price index or comparable data.'

An assessor may reassess real property "only if one of three triggering events has occurred—namely, (1) when the property has been 'purchased,' (2) when the property is 'newly constructed,' or (3) when 'a change in ownership has occurred.' (Cal. Const., art XIII A, § 2, subd. (a); § 110.1; *926 North Ardmore Ave. LLC v. County of Los Angeles* (2017) 3 Cal.5th 319, 326 . . . ; *Osco Drug, Inc. v. County of Orange* (1990) 221 Cal.App.3d 189, 192 . . .)." (*Prang, supra*, 54 Cal.App.5th at pp. 12–13.)

Although county assessors in some cases reassess property in the same assessment year that a triggering event occurred, in other cases there is a delay between the triggering event and reassessment. In that circumstance, "the county assessor has the authority—and a constitutional duty—to levy retroactive assessments to recapture any under-taxation in the prior years that would otherwise escape taxation due to the delay between the triggering event and the reassessment. (Rev. & Tax. Code, §§ 51.5, subd. (d), 531, 531.2; *Trailer Train Co. v. State Bd. of Equalization* (1986) 180 Cal.App.3d 565, 580.)" (*Prang, supra*, 54 Cal.App.5th at p. 8.)

"If . . . reassessment is appropriate, then the assessor has 'a constitutional [and a statutory] duty to levy retroactive assessments' 'if [he or she] discovers property has "escaped assessment." ' [Citations.] The duty to levy escape assessments springs from our Constitution's mandate that *'[a]ll* property . . . be taxed in proportion to its full value' (Cal. Const., art. XIII, § 1, subd. (b), italics added), and this mandate obligates assessors '(1) to assess all property in [their] jurisdiction and (2) to do so on

---

(Cal. Const., art. XIII A, § 2, subds. (a) & (b); see §§ 110.1, 110.)" (*Prang, supra*, 54 Cal.App.5th at p. 12.)

4

a uniform basis.' [Citation.] 'If any property subject to taxation should escape assessment in any year,' . . . 'the taxation for that year would not be equal and uniform, nor would all property in this State be taxed in proportion to its value, and the behest of the Constitution would not be obeyed.' [Citation.]" (*Prang*, *supra*, 54 Cal.App.5th at p. 14, italics omitted.)

>           *B.      Statutory Scheme for Challenging Assessments*

The Legislature has established a three-step process by which a taxpayer may challenge a regular or escape assessment. (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1307–1308 (*Steinhart*).) The first step is the filing of an application for assessment reduction (also referred to as an assessment appeal) under section 1603, subdivision (a), through a "verified, written application showing the facts claimed to require the reduction and the applicant's opinion of the full value of the property." (See *Steinhart*, at p. 1307; *Williams*, *supra*, 2 Cal.5th at p. 1269.) An application for assessment reduction is made to the "county board" (§ 1603)—i.e., to "a county board of supervisors meeting as a county board of equalization or an assessment appeals board." (§ 1601, subd. (a).) Applications for assessment reductions are resolved through an administrative appeals process that can involve a public hearing (§§ 1605.4, 1605.6), exchanges of information (§ 1606), examinations under oath (§ 1607), and the collection and introduction of additional evidence in support or refutation of an application (§§ 1609, 1609.4, 1609.5, 1610.2). (See generally *Williams*, *supra*, 2 Cal.5th at p. 1269.) The county board "shall make a record of the hearing" and, if requested, shall make "[w]ritten findings of fact," which "shall fairly disclose the board's determination of all material points raised by the party in his or her petition and at the hearing, including a statement of

the method or methods of valuation used in appraising the property." (§§ 1611, 1611.5.) Ultimately, " 'the county board shall equalize the assessment of property on the local roll by determining the full value of an individual property, by assessing any taxable property that has escaped assessment, correcting the amount, number, quantity, or description of property on the local roll, canceling improper assessments, and by reducing or increasing an individual assessment . . . .' (§ 1610.8.)" (*Williams*, *supra*, at p. 1269.)

The second step in the process is the filing of an administrative refund claim under sections 5096 et seq. (See *Steinhart*, *supra*, 47 Cal.4th at pp. 1307–1308.) This step may be satisfied by application for assessment reduction under section 1603 "if the applicant states in the application that the application is intended to constitute a claim for refund." (§ 5097, subd. (b).) If the applicant does not so state, "he or she may thereafter . . . file a separate claim for refund of taxes." (*Ibid.*)

The third and final step for challenging a regular or escape assessment is the filing of a refund action in a superior court pursuant to sections 5140 et seq. (See *Steinhart*, *supra*, 47 Cal.4th at pp. 1307–1308.) These sections provide that within six months of the date the county board makes its final decision, a taxpayer may bring an action in superior court "against a county or a city to recover a tax which the board of supervisors of the county or the city council of the city has refused to refund on a claim filed pursuant to Article 1 (commencing with Section 5096) of this chapter." (§ 5140; see also § 5141.)

**FACTUAL AND PROCEDURAL BACKGROUND**

    *A.    The Property*

    LA Live owns and manages a sports and entertainment development in downtown Los Angeles known as L.A. Live (the development). The development, which surrounds the Staples Center and Nokia Theatre, is made up of several distinct buildings and structures that were completed in 2007 and 2008. Three are relevant to the present appeal: the Regal Building (Assessor's Parcel Number (APN) 5138-007-094), Building A (APN 5138-007-097), and Building B (APN 513-007-098).[3]

    *B.    The "Escape Assessments"*

    On June 21, 2012, the Assessor mailed "Notices of Proposed Escape Assessment" (notices) to LA Live. The notices stated that the Assessor had reassessed the Regal Building, Building A, and Building B for the years 2008–2011, and intended to "enroll[]" the new assessments 10 days from the date of the notices.

    On June 26, 2012, five days after the notices were mailed, the Assessor transmitted the escape assessments to the Los Angeles County Auditor (Auditor). The Auditor levied property taxes on the Regal Building, Building A, and Building B

---

[3]    Building A has a total of 387,722 square feet of interior and exterior office and restaurant space. Its key tenants include the Grammy Museum, Conga Room, Club Nokia, Trader Vic's, Starbucks Coffee, Yard House, ABC Radio, Lucky Strikes Lanes and Lounge, Rosa Mexicano, Herbalife, The Farm of Beverly Hills, Rock'n Fish, and Wolfgang Puck Bar & Grill. Building B is five stories and has a total of 119,862 square feet of interior and exterior office, studio, and restaurant space. Its main tenant is ESPN Broadcast; other tenants include Lawry's Carvery Restaurant and ESPN Zone.

7

on August 4, 2012, and mailed adjusted property tax bills to LA Live on August 16, 2012.[4] The tax bills were based on the following assessments:

| Building | Tax Year | Prior Assessed Value | New Assessed Value | Net Tax Due |
|---|---|---|---|---|
| Regal | 2008 | $1,167,788 | $4,767,788 | $42,830 |
| | 2009 | $1,191,143 | $4,863,143 | $44,814 |
| | 2010 | $1,188,319 | $4,851,616 | $46,519 |
| | 2011 | $1,197,267 | $4,888,148 | $45,983 |
| Building A | 2008 | $2,000,628 | $41,693,128 | $472,237 |
| | 2009 | $2,040,640 | $112,074,990 | $1,342,904 |
| | 2010 | $2,035,803 | $111,809,371 | $1,393,969 |
| | 2011 | $2,051,132 | $112,651,294 | $1,377,911 |
| Building B | 2008 | $722,772 | $23,959,872 | $276,461 |
| | 2009 | $737,227 | $34,146,069 | $407,735 |
| | 2010 | $735,479 | $34,065,141 | $423,240 |
| | 2011 | $741,017 | $34,321,650 | $418,364 |

Collectively, the principal amount of property taxes levied as a result of the escape assessments was $6,292,967. On March 21, 2013, LA Live timely paid the property taxes due under the tax bills.

C. *LA Live's Request for Refund*

LA Live did not administratively appeal the escape assessments pursuant to section 1603 on the grounds raised in

---

[4] LA Live contends the escape assessments were "enrolled" within the meaning of section 531.8 when they were transmitted to the Auditor, and the trial court so found. The County disagrees, asserting that enrollment occurred when the Auditor processed the information provided by the Assessor—in this case, on August 4, 2012. For purposes of this appeal, we will assume without deciding that the escape assessments were enrolled when they were transmitted to the Auditor on June 26, 2012.

8

the present appeal.[5]  Instead, on September 20, 2016, it submitted a claim for refund pursuant to sections 5096 et seq., seeking reimbursement of the entirety of the taxes paid pursuant to the escape assessments.  LA Live claimed that in issuing the escape assessments, the County failed to comply with section 531.8, which required the Assessor to mail notices of escape assessment at least 10 days before enrolling the escape assessments.[6]  LA Live contended that because the Assessor had mailed the notices only five days before enrolling the escape assessments, rather than 10 days as required by statute, the assessments were void and subject to refund.

The County denied LA Live's claim for refund on March 1, 2017.

### D.     *The Present Action*

On September 1, 2017, LA Live filed the present action for refund of property taxes pursuant to section 5140.  LA Live's

---

[5]      In 2012 and 2013, LA Live filed administrative appeals challenging the assessed values of Building A and Building B, as well as of several other structures that comprise the development.  In those administrative appeals, LA Live asserted that the County had over-valued the property at issue, but did not claim the assessments were void.  Although LA Live and the County disagree about the proper characterization of these administrative appeals, both parties agree that the administrative appeals did not exhaust LA Live's administrative remedies for purposes of this action.

[6]      Section 531.8 provides, in relevant part:  "No escape assessment shall be enrolled under this article before 10 days after the assessor has mailed or otherwise delivered to the affected taxpayer a 'Notice of Proposed Escape Assessment' with respect to one or more specified tax years."

complaint alleged that section 531.8 required the Assessor to wait 10 days after issuing a notice of proposed escape assessment before enrolling the escape assessment. Because the Assessor did not wait the statutory 10-day period before enrolling the escape assessments, the escape assessments were "void and thus subject to refund." LA Live sought judgment of $6,292,967, plus interest and attorney fees.

The matter was tried to the court in November 2018. In lieu of live testimony, the parties submitted stipulated facts and exhibits. As relevant here, the parties stipulated that the Assessor entered the escape assessment for tax years 2008 through 2011 into the Property Tax Database on June 17, 2012, and mailed "Notices of Proposed Escape Assessment" to LA Live on June 21, 2012. The Assessor transmitted the escape assessment to the Auditor on June 26, 2012, and the escape assessments were placed on the Auditor's "Secure Tax Roll" the same day. The Auditor levied property taxes on the Regal Building, Building A, and Building B based on the escape assessments on August 4, 2012, and mailed tax bills to LA Live on August 16, 2012. LA Live submitted a claim for refund within four years of paying those taxes.

The trial court filed a statement of decision on February 15, 2019. It concluded that (1) nothing in the plain language of the Revenue and Taxation Code suggested that "ministerial violations of the 10 day [notice] period [of section 531.8] result in voiding an escape assessment," (2) interpreting the statute as LA Live suggested would create an absurd result, (3) the County substantially complied with the notice requirement of section 531.8, and (4) LA Live failed to exhaust its administrative remedies. Thus, the court found the assessments at issue were

"valid and should not be voided," and it awarded judgment in favor of the County.

LA Live timely appealed.

## DISCUSSION

LA Live contends that compliance with the 10-day notice provision of section 531.8 is essential to the County's taxing power, such that a failure to comply with section 531.8 renders the resulting assessments "ultra vires [and] void." LA Live thus urges that because the County enrolled the escape assessments fewer than 10 days after it mailed notices of such assessments, LA Live is entitled to a full refund of the property taxes paid pursuant to the assessments.

The County contends that as a predicate to bringing this action, LA Live was required to exhaust its administrative remedies by administratively challenging the escape assessments before the county board. Because LA Live indisputably failed to do so, the County urges LA Live's claims are not reviewable on the merits. In the alternative, the County urges that it fully or substantially complied with section 531.8.

As we discuss, parties generally must exhaust available administrative remedies as a prerequisite to seeking relief in the courts. In the property tax context, the exhaustion requirement means that a taxpayer ordinarily may not pursue a court action for a tax refund without first filing claims for reassessment and refund with the county board of equalization or assessment appeals board. Although there is a limited exception to this rule where a property tax assessment is a " 'nullity as a matter of law' "—i.e., where " 'the property is tax exempt, nonexistent or outside the jurisdiction [citations], and no factual questions exist regarding the valuation of the property' " (*Williams*, *supra*,

11

2 Cal.5th at p. 1275)—that exception does not apply in the present case.  Accordingly, LA Live was required to exhaust administrative remedies before initiating this action, and its failure to do so rendered its claim nonreviewable.

## I.
## Necessity of Exhausting
## Administrative Remedies

*A.     Exhaustion Requirement Generally*

The rule requiring exhaustion of administrative remedies is well settled.  " 'In general, a party must exhaust administrative remedies before resorting to the courts.  [Citations.]  Under this rule, an administrative remedy is exhausted only upon "termination of all available, nonduplicative administrative review procedures."  [Citations.]' (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080 (*Coachella Valley*); see also *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292–293.)" (*Williams*, *supra*, 2 Cal.5th at pp. 1267–1268.)

"[I]n California a requirement that administrative remedies be exhausted is jurisdictional." (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1151.)  Thus, "[t]he exhaustion rule ' "is not a matter of judicial discretion, but is a fundamental rule of procedure . . . binding upon all courts." ' (*Campbell v. Regents of the University of California* (2005) 35 Cal.4th 311, 321 (*Campbell*).)  . . .  '[T]he exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless

12

absolutely necessary).  [Citations].' (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 391; see also *Rojo v. Kliger* (1990) 52 Cal.3d 65, 83 [explaining that the exhaustion doctrine advances policy interests such as 'easing the burden on the court system, maximizing the use of administrative agency expertise and capability to order and monitor corrective measures, and providing a more economical and less formal means of resolving [a] dispute']; *Yamaha Motor Corp. v. Superior Court* (1986) 185 Cal.App.3d 1232, 1240 [observing that the exhaustion doctrine ' "facilitates the development of a complete record that draws on administrative expertise" ' and affords 'a preliminary administrative sifting process [citation], unearthing the relevant evidence and providing a record which the court may review'].)" (*Williams*, *supra*, 2 Cal.5th at p. 1268.)

In the property tax context, the requirement to exhaust administrative remedies is explicit in the governing statutes. Section 1603, subdivision (a) provides:  "A reduction in an assessment on the local roll shall not be made unless the party affected or his or her agent makes and files with the county board a verified, written application showing the facts claimed to require the reduction and the applicant's opinion of the full value of the property."  Section 5097, subdivision (a) provides in relevant part that "[a]n order for a refund . . . shall not be made, except on" the timely filing of a verified claim for refund.  And, section 5142, subdivision (a) provides that a court action may not "be commenced or maintained . . . unless a claim for refund has first been filed pursuant to Article 1 (commencing with Section 5096)," and "[n]o recovery shall be allowed in any refund action upon any ground not specified in the refund claim."  (See *Steinhart*, *supra*, 47 Cal.4th at p. 1307.)

13

In light of these statutes, our Supreme Court has explained that in the property tax context, "application of the exhaustion principle means that a taxpayer ordinarily may not file or pursue a court action for a tax refund without first applying to the local board of equalization for assessment reduction under section 1603 *and* filing an administrative tax refund claim under section 5097." (*Steinhart*, *supra*, 47 Cal.4th 1298, 1308, citing *Stenocord Corp. v. City etc. of San Francisco* (1970) 2 Cal.3d 984, 986–990 (*Stenocord*); see also *Williams*, *supra*, 2 Cal.5th at p. 1268.)

Whether the exhaustion requirement applies in a particular case raises legal issues, which we review de novo. (*Ortega v. Contra Costa Community College Dist.* (2007) 156 Cal.App.4th 1073, 1080; *Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1136.)

B.     The "Nullity Exception" and the Supreme Court's Decision in Parr-Richmond

Our Supreme Court has recognized a limited exception to the exhaustion rule in the property tax context where a tax assessment "is 'a nullity as a matter of law.' " (*Williams*, *supra*, 2 Cal.5th at p. 1264.) The court discussed this exception most recently in *Williams*, in the context of escape assessments imposed by the County of Fresno. In that case, the taxpayer took no action on the escape assessments for several years, but eventually paid the additional taxes and filed a refund action in superior court, asserting it had not owned most of the property at issue during the relevant years. The superior court sustained the county's demurrer on the ground that the taxpayer had failed to exhaust its administrative remedies; the appellate court reversed, concluding that because the taxpayer claimed it did not own the taxed property, it was not required to exhaust

14

administrative remedies.  (*Id.* at pp. 1265–1267.)  The county sought review.

The Supreme Court explained that as a general rule, a party must exhaust administrative remedies as a prerequisite for seeking relief in the courts.  Prior cases had recognized exceptions to this general rule, however, " 'when the administrative agency cannot provide an adequate remedy' and 'when the subject of [a] controversy lies outside the agency's jurisdiction.' "  (*Williams, supra,* 2 Cal.5th at p. 1274.)  In the property tax context, cases had recognized an additional exception " 'when the assessment " '*is a nullity as a matter of law* because, for example, the property is tax exempt, nonexistent, or outside the jurisdiction [citations], and no factual questions exist regarding the valuation of the property which, upon review by the board of equalization, might be resolved in the taxpayer's favor, thereby making further litigation unnecessary [citations].' (*Stenocord, supra,* 2 Cal.3d at p. 987.)"  (*Williams, supra,* 2 Cal.5th at p. 1275, italics added.)

In an earlier decision, *Parr-Richmond Industrial Corp. v. Boyd* (1954) 43 Cal.2d 157 (*Parr-Richmond*), the court had applied the nullity doctrine where, as in *Williams*, a taxpayer " 'attack[ed] the assessment as void because he [did] not own the property on which the tax demand was made.' "  (*Williams, supra,* 2 Cal.5th at p. 1275.)  Under those circumstances, the *Parr-Richmond* court had held that exhaustion of administrative remedies was unnecessary because the tax had been "levied against a greater property interest than [the taxpayer] allegedly owned," and hence was "illegal."  (*Parr-Richmond, supra,* 43 Cal.2d at p. 165.)  The *Parr-Richmond* court had explained: " 'While in one sense it is true that almost any mistake which

15

results in an excessive assessment amounts to an overvaluation of the property of a taxpayer, we think there is a real and distinct difference between those cases in which it may properly be said that the error is one of overvaluation and those cases in which the overvaluation is a mere incidental result of an erroneous assessment of property which should not have been assessed.' " (*Parr-Richmond*, at p. 165.) Accordingly, "plaintiff's theory of relief—from an illegal tax because it was levied against a greater property interest than it allegedly owned . . . did not require its prior application to the board of equalization before recourse to the court." (*Ibid.*)

The *Williams* court overruled *Parr-Richmond*, holding that a taxpayer is required to exhaust administrative remedies even if it claims it does not own the assessed property. (*Williams*, *supra*, 2 Cal.5th at p. 1265.) The court noted that current law had expanded the role of county boards, expressly giving them jurisdiction over valuation *and* nonvaluation issues, and also had provided a procedure by which a taxpayer could avoid the assessment appeals process if the taxpayer and the assessor stipulated that an assessment challenge involved only nonvaluation issues, and the board accepted the stipulation.[7]

---

[7] Section 5142, subdivision (b) provides, in relevant part: "When the person affected or his or her agent and the assessor stipulate that an application involves only nonvaluation issues, they may file a stipulation with the county board of equalization stating that issues in dispute do not involve valuation questions. . . . The board shall accept or reject the stipulation, with or without conducting a hearing on the stipulation. The filing of, and the acceptance by the board of, a stipulation shall be deemed compliance with the requirement that the person affected file and prosecute an application for reduction under Chapter 1

(*Id.* at pp. 1270–1271.)  These statutes, the court said, evidenced the Legislature's intent that claims as to which *no* stipulation had been entered should be submitted to a county board as a prerequisite to maintaining a refund action under section 5140. The court explained:  "[T]he stipulation procedure bespeaks a legislative determination that the county board should, in the first instance, pass on this question, or decide that it need not do so.  Indeed, the whole stipulation process—part of a 'carefully crafted statutory scheme the Legislature has, within its constitutional authority, put in place' [citation]—would be meaningless, and section 5142, subdivision (b) would be surplusage, if an exhaustion requirement did not apply to nonvaluation issues.  If that were true, there would be no need for a taxpayer to seek a stipulation in order to obtain judicial review of a challenge to an assessment when the dispute did not involve a valuation issue." (*Williams*, *supra*, 2 Cal.5th at pp. 1271–1272, fn. omitted.)

The court noted, moreover, that requiring exhaustion of administrative remedies in the case before it advanced "the purposes served by the exhaustion of administrative remedies in general." (*Williams*, *supra*, 2 Cal.5th at p. 1272.)  It explained that nonvaluation challenges typically involve questions of fact, and thus the assessment appeal process "would facilitate the development of a record conducive to judicial review.  The parties also might resolve their disagreement over ownership through the administrative process.  Such an outcome could eliminate the need to pay the tax under dispute and bring a refund action, and

---

(commencing with Section 1601) of Part 3 in order to exhaust administrative remedies."

17

thereby lessen the burden on the courts." (*Ibid.*)  Further, the court said, recognizing an assessment appeal as subsumed within the exhaustion requirement "also supplies a timeline for the presentation and resolution of disputes such as this one.  There is a timeframe defined by statute for bringing and resolving an assessment appeal through administrative channels.  (§§ 1603, subds. (b)–(d), 1604, 1605, subds. (b)–(e).)  But no comparable deadline exists when the nullity exception applies.  Where exhaustion is excused, therefore, the predictable result is stale claims like the one before the court in this case.  The passage of time can make these claims difficult to adjudicate; it also hinders counties' ability to predict and budget for revenue." (*Id.* at pp. 1272–1273.)

Finally, the court noted that as a result of legislative enactments, the modern assessment appeals process is significantly more robust than it was when *Parr-Richmond* was decided.  (*Williams*, *supra*, 2 Cal.5th at p. 1280-1281.)  The court explained that in the 1950's, the assessment appeals process "was informal and incorporated few features conducive to the development of a robust record." (*Id.* at p. 1280.)  In the 1960's, however, "the Legislature took substantial steps to make the assessment appeal process a more effective mechanism for challenging an assessment, and to improve the ability of a taxpayer to develop an administrative record that could usefully inform subsequent judicial proceedings." (*Id.* at p. 1281.)  Thus, although the *Parr-Richmond* court in 1954 may have regarded the assessment appeals process "as having little value in advancing the purposes served by the exhaustion rule," it was apparent that such proceedings before a county board "can serve useful purposes today." (*Id.* at pp. 1281–1282.)

18

For all of these reasons, the court overruled *Parr-Richmond* to the extent that it extended the nullity exception to cases where the sole basis for invoking the exception was an assertion that a taxpayer did not own taxable property. (*Williams*, *supra*, 2 Cal.5th at p. 1282.) Instead, the court said, "a claim of nonownership of nonexempt assessed property, by itself, will not provide a sufficient basis for invoking the nullity exception and thereby avoiding the assessment appeal process when a taxpayer seeks a reduction in an assessment on the local roll." (*Id.* at p. 1283.)[8]

In so holding, the court did not purport to overrule, and therefore implicitly left intact, the much more limited version of the nullity exception articulated in its earlier cases, which had applied the exception where "it is readily ascertainable that the property or interest lies beyond the county's legal authority to tax," for example because " 'the property is tax exempt, nonexistent, or outside the jurisdiction.' " (*Williams*, *supra*, 2 Cal.5th at pp. 1278, 1275.) In such cases, *Williams* said, the nullity exception may appropriately be invoked because "a dispute will not squarely implicate the county board's valuation expertise, and the other public interests advanced by exhaustion—including the ability of the government to timely anticipate and collect revenue—would not be unduly compromised by allowing a refund action to proceed without prior

---

[8]     The court held, however, that because the taxpayer in the case before it might reasonably have relied on *Parr-Richmond* to conclude that it was unnecessary to exhaust administrative remedies before filing a tax refund action, the court's holding would apply prospectively only. (*Williams*, *supra*, 2 Cal.5th at p. 1282.)

exhaustion through an assessment appeal." (*Id.* at pp. 1278–1279.)

## II.
## LA Live's Challenge to the Escape Assessments Is Not Reviewable Because LA Live Failed to Exhaust Its Administrative Remedies

The parties agree that LA Live did not its exhaust its administrative remedies by filing an application for assessment reduction with the county board pursuant to section 1603. The question before us, therefore, is whether LA Live was required to do so, as the County contends, or was excused from exhausting administrative remedies because the escape assessments were null as a matter of law, as LA Live contends.[9] For the reasons that follow, we conclude that LA Live was required to pursue its administrative remedies before initiating this action, and that its failure to do so bars consideration of this case on the merits.

As we have described, although *Williams* did not completely eliminate the nullity exception in the property tax context, it significantly limited its application to cases where "it is readily ascertainable that the property or interest lies beyond

---

[9] Throughout its briefs, LA Live refers to the escape assessments as "void," rather than as "null." The two words are synonymous (see, e.g., Merriam-Webster Dictionary <https://www.merriam-webster.com/dictionary/void> [defining "void" as "of no legal force or effect: null"] [as of Feb. 26, 2021], archived at https://perma.cc/UQ6C-QBGE); Black's Law Dictionary (5th ed. 1979) p. 1411, col. 2 [defining "void" as "[n]ull; ineffectual; nugatory; having no legal force or binding effect"]); thus, because California case law refers to assessments as to which administrative remedies need not be exhausted as "null" assessments, we will use that nomenclature in this opinion.

the county's legal authority to tax," for example because "the property is tax exempt, nonexistent, or outside the jurisdiction.' " (*Williams*, *supra*, 2 Cal.5th at pp. 1278, 1275.)  Here, it is undisputed that the parcels at issue are within the County's taxing authority:  While LA Live challenges the timeliness of the notices of proposed escape assessments, it does not contend that the parcels are outside the County's boundaries, are exempt from taxation, or do not exist.  As such, the present case does not fall within the narrow nullity exception left intact by *Williams*.

Moreover, application of the exhaustion rule to the circumstances present here advances the purposes served by the exhaustion requirement.  The present case turns, in part, on questions of fact, including when the escape assessments were enrolled, and whether LA Live's 2012 and 2013 administrative appeals addressed any aspect of the escape assessments. Administrative exhaustion before the county board would have resolved these issues, thus "facilitat[ing] the development of a record conducive to judicial review.  (See *Williams*, *supra*, 5 Cal.5th at p. 1272.)  Administrative exhaustion also would have ensured that LA Live's claims were litigated within the statutory timeframe, thus avoiding the present circumstance in which challenges to a June 2012 assessment were not filed until September 2016.  As *Williams* noted, "[t]he passage of time can make these claims difficult to adjudicate; it also hinders counties' ability to predict and budget for revenue." (*Williams*, *supra*, 5 Cal.5th at p. 1273.)  The latter concern is particularly salient here, where the challenged assessment exceeds six million dollars.

Notwithstanding the foregoing, LA Live urges that the escape assessments were legally null, and thus were not subject

21

to administrative exhaustion requirements, because the County acted in excess of its statutory taxing power when it imposed the escape assessments. In LA Live's view, because the County " 'is a creature of limited powers,' " its actions necessarily are "ultra vires [and] void" whenever it fails to strictly comply with statutory procedures. But in so urging, LA Live makes no attempt to address the Supreme Court's analysis in *Williams*, where the taxpayer's claim—that it had been assessed a tax on property it did not own—plainly asserted a statutory violation. (See § 405, subd. (a) ["the assessor shall assess all the taxable property in his county, except state-assessed property, *to the persons owning, claiming, possessing, or controlling it on the lien date*," italics added].) Because this statutory violation was the express basis for the taxpayer's refund claim in *Williams*, the Supreme Court necessarily would have found the escape assessment in *Williams* to have been null were the nullity doctrine as broad as LA Live contends. The court's rejection of the nullity exception in *Williams*, therefore, fatally undermines the extremely broad application of the doctrine LA Live espouses.

We note, moreover, that the legal violation urged in *Williams* (assessing a property tax against a nonowner) is more fundamentally inconsistent with the County's taxing powers than is the violation urged in this case—issuing an escape assessment on five days, rather than on 10 days, notice. Because the Supreme Court held in *Williams* that the alleged legal error did not nullify the assessment, we have no difficulty reaching the same conclusion here.

None of the cases cited by LA Live compels a different result. Two of the cases, *House v. Los Angeles County* (1894) 104 Cal. 73 and *Selby v. Oakdale Irr. Dist.* (1934) 140 Cal.App.

22

171 do not concern the validity of tax assessments: *House* addressed an alleged breach of contract, and *Selby* concerned an alleged failure to pay amounts due on irrigation bonds. Two other cases, *Ferguson v. Gardner* (1927) 86 Cal.App. 421 and *Ryan v. Byram* (1935) 4 Cal.2d 596 concluded, contrary to claims made by the plaintiff taxpayers, that the defendant public entities were empowered to collect the taxes at issue. (*Ferguson*, at pp. 424, 429 [rejecting claim that special property tax was "null, void, and of no effect"]; *Ryan*, at p. 610 ["the two levies of August 31, 1935, . . . are valid"].) And another case, *People v. Coghill* (1874) 47 Cal. 361, which was decided nearly 150 years ago, considered a question entirely different than the one presented in this case—namely, the legality of an assessment levied on real property "viewed" by two commissioners, rather than three.

Just three of the cases cited by LA Live are relevant to the issues before us in this appeal, and none assists LA Live. In *Westinghouse Elec. Corp. v. County of Los Angeles* (1974) 42 Cal.App.3d 32, the plaintiffs, like LA Live here, asserted that they should be permitted to pursue a court action to recover property taxes without first pursuing administrative remedies. The plaintiffs "[did] not contend that the property upon which tax was assessed [was] tax-exempt, outside the jurisdiction, or nonexistent," but instead urged that the assessments were void because the County's assessment practices violated the law in various ways, including by applying a discriminatory assessment ratio, failing to equalize assessments on business personal property, and practicing " 'systemic fraud.' " (*Id.* at pp. 37, 39.) The court rejected the plaintiffs' contention, noting that the Supreme Court had previously held that administrative

23

exhaustion was excused " 'only in those cases wherein the assessment is totally void as an attempt to tax property not subject to taxation, rather than merely an inaccurate assessment of the value of taxable property.' " (*Id.* at p. 38, quoting *Stenocord*, *supra*, 2 Cal.3d at p. 990.) In the case before the court, the plaintiffs' claims of illegality "[did] not excuse appellants from the requirement that they have exhausted their remedy before the county board of equalization before filing the lawsuit at bench." (*Westinghouse*, at pp. 38–39; see also *id.* at pp. 39–43.)

Finally, in *Gaumer v. County of Tehama* (1967) 247 Cal.App.2d 548 (*Gaumer*) and *Tamco Development Co. v. County of Del Norte* (1968) 260 Cal.App.2d 929 (*Tamco*), the courts held taxpayers were excused from exhausting administrative remedies because they received *no notice* of the assessments prior to receiving their tax bills, failures that "made it impossible for plaintiffs to apply for a hearing or appeal before the board at the prescribed times." (*Gaumer*, at p. 553.)[10] In the

---

[10]   In *Gaumer*, taxpayers were given no notice of the increased assessments before they received their tax bills, a failure that "made it impossible for plaintiffs to apply for a hearing or appeal before the board at the prescribed times." (*Gaumer*, at p. 553.) Nonetheless, the taxpayers "*did* go before the supervisors as soon as they could and . . . were there denied relief." (*Ibid.*) Under those circumstances, the court said, the litigation was proper. (*Ibid.*) Similarly, in *Tamco*, the county assessor failed to notify taxpayers of an increased assessment, and thus the taxpayers did not timely administratively challenge the assessment "because [they] had no knowledge of the increase from any source." (*Id.* at p. 930.) They nonetheless applied to the board of supervisors for relief "at their earliest opportunity." (*Id.* at p. 935.) On this

24

present case, in contrast, LA Live admittedly received notices of the proposed escape assessments—and, although the notices were issued five days later than the statute required, LA Live received them well within the statutory time to file an application for assessment reduction.  (See § 1603, subd. (a) [application for reduction "shall be filed within the time period from July 2 to September 15"].)

LA Live's citations to various administrative materials issued by the State Board of Equalization also fail to persuade us that the County's assertedly untimely notice of the proposed escape assessments excused LA Live from exhausting administrative remedies.  At most, the administrative materials LA Live cites suggest that compliance with section 531.8 is "mandatory," and thus that failure to give proper notice renders an escape assessment "invalid."  But as the County notes, even if an act required by a public entity is "mandatory" (i.e., nondiscretionary), the public entity's failure to do the act does not invariably invalidate the government action to which the act relates.  Indeed, our Supreme Court has explained in an analogous context that there are many procedural rules "that are not directory[,] but mandatory; these are binding, and parties must comply with them to avoid a default or other penalty." (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 341–342.)  Nonetheless, " 'failure to comply does not render the proceeding void' *in a fundamental sense. . . .*" (*Ibid.*, italics added.)  Thus, for example, "a statute of limitations may be 'mandatory in the sense that the court may not excuse a late

_____

record, the taxpayers were entitled to pursue their action in court.  (*Id.* at p. 932.)

25

complaint on grounds of mistake, neglect, or the like,' but 'it is not 'jurisdictional.'" ' " [Citation.] A properly raised objection to an untimely complaint may require that the court dismiss it, and the court's failure to dismiss is reversible on appeal. But a party cannot raise the untimeliness for the first time on appeal or in a collateral attack. If an untimely complaint results in a judgment, the judgment will not be disturbed on timeliness grounds if the defendant did not properly preserve a statute of limitations defense." (*Ibid.*)

The principles articulated in *Kabran* and *Williams* suggest that although assessments levied without proper notice may be vulnerable to reversal through proper administrative channels, they do *not* entitle a taxpayer to a reversal if it has not made use of those channels. LA Live's failure to exhaust administrative remedies, therefore, is fatal to its claim.

## CONCLUSION

For all of these reasons, the County's apparent failure to timely comply with the notice provision of section 531.8 did not excuse LA Live from challenging the failure through prescribed administrative channels. The trial court therefore properly concluded that LA Live had failed to exhaust administrative remedies and, therefore, declined to review its claims on the merits.

26

## DISPOSITION

The judgment is affirmed.  The County is awarded its appellate costs.

**CERTIFIED FOR PUBLICATION**


                                        EDMON, P. J.

We concur:


        LAVIN, J.


        DHANIDINA, J.


27